**UNITED STATES of America,
Plaintiff,**

v.

**Shawn E. STEWART, Defendant.**

**No. 98–40097–01–SAC.**

United States District Court,
D. Kansas.

Jan. 28, 1999.

Mark L. Bennett, Jr., Bennett & Dillon, L.L.P., Topeka, KS, for defendant.

Randy M. Hendershot, Office of United States Attorney, Topeka, KS, for plaintiff.

Steven D. Rosel, Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

On October 14, 1998, the grand jury returned a twelve count indictment charging the defendant with six separate counts of committing robberies affecting interstate commerce (in violation of 18 U.S.C. § 1951 (Hobb's Act)), and six separate counts of using and carrying a firearm during and in relation to crimes of violence (in violation of 18 U.S.C. § 924(c)(1)). The crimes are alleged to have occurred in Topeka and Lawrence, Kansas.

This case comes before the court upon the following pretrial motions:

1. Defendant's "Motion to Suppress" (Dk.15).

The government has filed a response opposing the defendant's motion. (Dk.19).

**1138**

2. Government's "Motion to Compel Giving of Hair Sample" (Dk.18).

The defendant has filed a response, opposing the government's motion.

On January 15, 1999, the court conducted a hearing to consider the parties' respective motions. At the close of the hearing, the court took the matter under advisement. Having considered the arguments and briefs of counsel, the evidence presented, and the applicable law, the court is now prepared to rule.

## 1. Defendant's "Motion to Suppress" (Dk.15).

On September 4, 1998, Stewart was arrested as a suspect in a robbery which occurred in Topeka, Kansas. According to the defendant's brief, following his arrest he was placed in an interrogation room where he was informed of his *Miranda* rights. According to the defendant, he told Detective Lowe of the Topeka Police Department that he would not talk to him and that he wanted an attorney. The defendant was then transported to the Shawnee County, Kansas, Department of Corrections. Although he had invoked his *Miranda* rights, over the course of the next three days Detective Brown of the Lawrence, Kansas, Police Department and FBI Agent Phil Andrews conducted custodial interrogations without the presence of counsel. Stewart claims that he repeatedly told the Shawnee County corrections officers that the did not want to talk to either Detective Brown or Agent Andrews and that he wanted to speak to an attorney. Instead of honoring his requests, Detective Brown and Agent Andrews obtained a handwritten note from the defendant's mother. The note was written by Stewart's mother while she was at the hospital, apparently having suffered a heart attack. Bowing to the repeated pressure of the officers to speak without the presence of an attorney, the defendant confessed orally and in writing without the benefit of counsel.

Although the defendant signed a written waiver of his *Miranda* rights, the defendant contends that the waiver was signed only after his right to speak to an attorney had been violated. In his confession, Stewart admits to committing robberies in both Topeka and Lawrence. Stewart seeks suppression of his statements and evidence obtained as a direct result of his "unlawful interrogation."

The government, in a one page response, succinctly states that none of the records within its possession indicate that "the defendant, contrary to his now-expressed position, never asked that he be allowed to consult with an attorney."

### Legal Standards

In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." "These safeguards include certain rights that an accused must be informed of and must waive before custodial interrogation can commence." *United States v. Bautista*, 145 F.3d 1140, 1146 (10th Cir.), cert. denied, —— U.S. ——, 119 S.Ct. 255, 142 L.Ed.2d 210 (1998). Specifically,

[a suspect] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda*, 384 U.S. at 479, 86 S.Ct. 1602. "Only if there is a voluntary, knowing, and intelligent waiver of these rights can authorities question a suspect without counsel being present and introduce at trial in the case-in-chief any statements made during the interrogation." *Bautista*, 145 F.3d at 1146.

"In *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court added a second layer of prophylaxis to the *Miranda* right to counsel," *Bautista,* 145 F.3d at 1146, holding that a suspect who has "expressed his desire to . deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication."

■ "If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." *McNeil v. Wisconsin,* 501 U.S. 171, 177, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). "This is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.'" *Id.* (*citing Michigan v. Harvey,* 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990)).

"Moreover, unlike an accused's Sixth Amendment right to counsel, the *Edwards* rule is not offense specific." *Id.; Arizona v. Roberson,* 486 U.S. 675, 685, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). "Once a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding any offense unless counsel is present." *McNeil,* 501 U.S. at 177, 111 S.Ct. 2204, 115 L.Ed.2d 158. *Bautista,* 145 F.3d at 1147.

■ "Once a suspect has invoked the right to counsel, knowledge of that request is imputed to all law enforcement officers who subsequently deal with the suspect." *United States v. Scalf,* 708 F.2d 1540, 1544 (10th Cir.1983). *See Bautista,* 145 F.3d at 1149 n. 6 (*quoting Scalf*).

### Burden of Proof

■ If a defendant talks to police after being advised of his right to remain silent, the government bears the burden of proving by a preponderance of the evidence that the waiver of the right was voluntary. *Colorado v. Connelly,* 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *United States v. Johnson,* 42 F.3d 1312, 1318 (10th Cir.1994) (when a *Miranda* violation is alleged to have occurred, the burden of proof rests with the government to prove the validity of the waiver by a preponderance of the evidence) (*citing Colorado v. Connelly,* 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986)), *cert. denied,* 514 U.S. 1055, 115 S.Ct. 1439, 131 L.Ed.2d 318 (1995).

An express statement of waiver by the defendant is not required; instead, waiver can be inferred from the defendant's actions and words. *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). To establish a voluntary waiver of Fifth Amendment rights, the government must show (1) that the waiver was the product of free and deliberate choice rather than intimidation, coercion, or deception; and (2) that the waiver was made in full awareness of the nature of the right being waived and the consequences of waiving. *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). Only if the totality of the circumstances surrounding the interrogation shows both an uncoerced choice and the requisite level of comprehension can a waiver be effective. *Id.; United States v. Hernandez,* 93 F.3d 1493, 1501 (10th Cir. 1996). To evaluate whether a statement or confession was coerced, we consider the characteristics of the defendant, the circumstances surrounding the statements, and the tactics employed by the police. *United States v. Guerro,* 983 F.2d 1001, 1004 (10th Cir.1993).

*United States v. Toro–Pelaez,* 107 F.3d 819, 825 (10th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 129, 139 L.Ed.2d 78 (1997).

■ When a defendant challenges the use of his statements on the ground that they were involuntary, it is the duty of this

court "to examine the entire record and make an independent determination of the ultimate issue of voluntariness." *Davis v. North Carolina,* 384 U.S. 737, 741–42, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966). The government has the burden of proving by at least a preponderance of evidence that a confession was voluntary. *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *see United States v. Robertson,* 19 F.3d 1318, 1321 (10th Cir.), *cert. denied,* 513 U.S. 906, 115 S.Ct. 271, 130 L.Ed.2d 189 (1994). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *United States v. Robertson,* 19 F.3d at 1321 ("In other words, the police must somehow overreach by exploiting a weakness or condition known to exist.").

In *United States v. Glover,* 104 F.3d 1570 (10th Cir.1997), the Tenth Circuit set forth the appropriate inquiry for determining the voluntariness of a defendant's statements:

Incriminating statements obtained by government acts, threats, or promises that permit the defendant's will to be overborne run afoul of the Fifth Amendment and are inadmissible at trial as evidence of guilt. *Malloy v. Hogan,* 378 U.S. 1, 7, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). In determining whether a particular confession is coerced, we consider the following factors: (1) the age, intelligence, and education of the defendant; (2) the length of the detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of her constitutional rights; and (5) whether the defendant was subjected to physical punishment. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *see Colorado v. Connelly,* 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (A defendant's mental condition does not by itself determine the issue of voluntariness). The determination of voluntariness is based on the totality-of-the-circumstances; none of the single factors

listed above is determinative. *Id.* Accordingly, this court must be mindful of all of the circumstances surrounding a defendant's interrogation, including the particular defendant's characteristics. *See id.*

*Id.* at 1579. "In no case, however, is any single factor determinative." *United States v. Chalan,* 812 F.2d 1302, 1307 (10th Cir.1987), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988); *see United States v. Short,* 947 F.2d 1445, 1449 (10th Cir.1991), *cert. denied,* 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992).

■ In deciding if the waiver was intelligent, the court looks at whether "the defendant knew that he did not have to speak to police and understood that statements provided to police could be used against him." *United States v. Hernandez,* 913 F.2d 1506, 1510 (10th Cir.1990) (citation omitted), *cert. denied,* 499 U.S. 908, 111 S.Ct. 1111, 113 L.Ed.2d 220 (1991). The defendant need not appreciate "the tactical advantage of remaining silent" for the waiver to be intelligent. *Id.* The Supreme Court has "never 'embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness.'" *Connecticut v. Barrett,* 479 U.S. 523, 530, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987) (*quoting Oregon v. Elstad,* 470 U.S. 298, 316, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)).

### Interrogation

■ For purposes of *Miranda,* interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). "*Miranda* applies only if an individual is subject to 'either express questioning or its functional equivalent.'" *United States v. Davis,* 40 F.3d 1069, 1078 (10th Cir.1994) (*quoting Rhode Island v. Innis,* 446 U.S. at 300–01, 100

S.Ct. 1682, 64 L.Ed.2d 297), *cert. denied,* 514 U.S. 1088, 115 S.Ct. 1806 , 131 L.Ed.2d 732(1995).

### Waiver of Right to Counsel

An accused's Fifth Amendment right to counsel attaches when he invokes that right during a custodial interrogation. *Miranda v. Arizona,* 384 U.S. at 444–45, 86 S.Ct. at 1612. Once an attorney is requested, all questioning must cease until counsel is provided unless the right to counsel is waived. *Miranda,* 384 U.S. at 473–74, 86 S.Ct. at 1627–28; *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981). An accused can waive his previously invoked right to counsel if he initiates further communications with the law enforcement officials. *Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85; *Oregon v. Bradshaw,* 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 2834–35, 77 L.Ed.2d 405 (1983). However, the government must show that the defendant effectively waived his Fifth Amendment right to counsel. *Oregon,* 462 U.S. at 1044–45, 103 S.Ct. at 2834–35.

*Johnson,* 42 F.3d at 1318. "Although a suspect can subsequently waive his right to counsel, 'a valid waiver of that right cannot be established by showing only that [the suspect] responded to further police-initiated custodial interrogation even if he has been advised of his rights.' " *Bautista,* 145 F.3d at 1147 n. 2. (*quoting Edwards,* 451 U.S. at 484, 101 S.Ct. 1880, 68 L.Ed.2d 378).

### Reinitiation of Interrogation following Invocation of Right to Remain Silent

■ In *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the Supreme Court addressed whether the issue of whether a resumption of questioning is permissible where a person in custody has invoked his right to remain silent. *Id.* at 101, 96 S.Ct. 321. The Supreme

Court concluded that the resolution of this issue was governed by the following passage from *Miranda:* "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 100, 96 S.Ct. 321 (*quoting Miranda,* 384 U.S. at 473–74, 86 S.Ct. at 1627). Further questioning of a defendant who has invoked his right to remain silent is only permissible if law enforcement officers "scrupulously honor" the defendant's assertion of the right to remain silent. *Id.* at 104, 96 S.Ct. 321 ("We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' "). "To determine whether a suspect's right to cut off questioning was 'scrupulously honored,' *Mosley* established a multi-factor test that includes an inquiry into the amount of time that lapsed between interrogations; the scope of the second interrogation; whether new *Miranda* warnings were given; and the degree to which police officers pursued further interrogation once the suspect had invoked his right to silence." *United States v. Schwensow,* 151 F.3d 650, 658 (7th Cir.1998) (*citing Mosley,* 423 at 104–05, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313), *cert. denied,* —— U.S. ——, 119 S.Ct. 626, 142 L.Ed.2d 565 (1998).

### Findings of Fact[1]

The court has summarized the relevant facts of this case in a chronological fashion. In this case, Stewart was interviewed by law enforcement officers on four separate occasions across the course of three days:

**September 4, 1998, around noon:**

On September 4, 1998, Shawn Stewart was arrested by Topeka police officers as a suspect in the robbery of a Topeka, Kansas, "Sonic" drive-in. Stewart is a twenty-six year old man. Topeka Police

---

1. The court notes at the outset that Stewart did not testify at the January 15, 1999, hearing.

Department Detective Kip Lowe conducted a videotaped interview of Shawn Stewart.[2] During the initial ten minute interview, Stewart received the *Miranda* warnings. Stewart indicated that he had received the *Miranda* warning on another prior occasion. At Detective Lowe's request, Stewart signed a consent to search an automobile seized by police officers. After Detective Stewart described the multiple eye witness identifications of Stewart and the other incriminating evidence collected by police, Stewart indicated that he did "not want to talk about a robbery."

Although Stewart invoked his right to remain silent, and although Detective Lowe himself recognized that Stewart invoked his right to remain silent, approximately twenty minutes after the initial interview, Detective Lowe returned to the interview room in an attempt to convince Stewart that this was his opportunity to help himself by confessing to the Sonic robbery. During this time frame, Detective Lowe conducted a second interrogation, or its functional equivalent, of Stewart.[3] During that interrogation, Stewart did not confess to any of the crimes charged in this indictment, but instead attempted to exonerate himself from the Sonic robbery. Although many of Stewart's statements are exculpatory in nature, based upon the untenable and inconsistent story concocted by Stewart during this second interrogation by Detective Lowe, one could possibly infer guilt of one or more criminal acts from those statements.

Ultimately, however, Stewart reaffirms his desire to remain silent and to not provide the information sought by Detective Lowe.

At no point during any part of the videotaped interview did Stewart ask to speak to an attorney. Stewart is subsequently transported to the Shawnee County Correction facility.

**September 4, 1998, beginning around 3:50 in the afternoon and ending around 7:10 in the evening:**

Aware of the similarities in the description and modus operandi between Stewart and the perpetrator of a robbery of the "Shark's Surf Shop" in Lawrence, Kansas, Lawrence Police Department Detective Michael Brown, conducted an interview of Stewart at the Shawnee County Correction facility. After collecting biographical material from Stewart, Detective Brown read Stewart the *Miranda* warnings. Detective Brown asked Stewart if he understood his rights and if he wished to waive them. Stewart indicated that he wanted to waive his rights.

Explaining that he had absolutely no interest in the Topeka Sonic robbery, Detective Brown asked Stewart questions about "a Lawrence robbery." Despite repeated attempts to direct Stewart's focus to the Lawrence robbery, Stewart insisted on discussing the Sonic robbery, offering alibis and other exculpatory explanations of innocence. Detective Brown again stated that he was only interested in discussing the Lawrence robbery. In response, Stewart asked Detective Brown if he was "talking about a bank robbery."[4] Until

---

2. During the hearing, the government offered Government Exhibit Number 1, a videotape of the defendant's post-arrest interrogation by Detective Lowe. As the defendant had not previously viewed the tape, the court took the admissibility of the exhibit under advisement, affording the defendant an opportunity to object to the exhibit. No objection to the videotaped confession was timely filed by the defendant. Consequently, Government Exhibit Number 1 is admitted for purposes of this hearing.

3. When testifying before this court, Detective Lowe completely omitted any reference to this interrogation that followed Stewart's invoca-

tion of his right to remain silent. Nor did the defendant raise this specific issue. Had the court simply turned off the VCR after the completion of the initial interview in reasonable reliance on Detective Lowe's testimony under oath regarding the length of the interview, these facts would not have been known to the court.

4. The indictment in this case does not charge Stewart with bank robbery. The indictment charges robberies of the Lawrence Pizza Company in Lawrence, Kansas, Shark's Surf Shop in Lawrence, the Sonic Drive-in in Topeka, Kansas, Boss Hawg's Barbeque in

that statement, Detective Brown did not suspect Stewart as the perpetrator of the robbery of a bank in Lawrence.

After that point, Stewart's recall regarding the time he had taken his "last trip to Lawrence" wavered substantially. Near the conclusion of the interview, Detective Brown indicated to Stewart that he considered Stewart to be a suspect in the Lawrence bank robbery. Stewart indicated that he "was done talking" and the interview concluded.

After interviewing Stewart, Detective Brown interviewed Stewart's mother. The next day, Detective Brown received a page from Stewart's mother, who was then at the hospital. Stewart's mother suffered an apparent heart attack. Stewart's mother consented to the search of her home and Stewart's room within her home. Stewart's mother provided the detective keys to her residence. Stewart's mother also asked Detective Brown to tell Stewart several things. Rather than attempt to convey some lengthy oral message, Detective Brown agreed to take a letter from Stewart's mother to Stewart.

Detective Brown subsequently filed an application for a search warrant on Stewart's mother's home and on another house where Stewart was also believed to reside. Search warrants were granted, and incriminating items are seized.

**September 5, 1998, beginning around 8:20 in the evening and concluding around 2:30 a.m. on September 6, 1998:**

Detective Brown returns to the Shawnee County Correction facility. He is accompanied by FBI Agent Andrews. FBI Agent Andrews is interested in interviewing Stewart about the Lawrence bank robbery. Detective Brown is interested in delivering Stewart a copy of the search warrant, including a list of the items seized during the execution of the search warrant, and hopefully to conduct a further interview regarding the Lawrence robbery.

Topeka, Wendy's in Topeka, and Paisano's Restaurante in Topeka, in violation of 18

In order to meet with Detective Brown and Agent Andrews, Stewart was escorted from his cell to the interview room. As Stewart exited the door from the module in the jail in which he was housed, he stated in an angry tone, "I don't want to talk to any of you mother-fuckers, I want my lawyer." Shawnee County Corrections Officer Ted Phelps responded by stating to Stewart, "I got nothing to do with it, you can tell those guys whatever you want to tell them. If you don't want to talk to them, you can tell them you don't want to talk to them. I've got to take you downstairs because they have papers to serve on you." Officer Phelps proceeded to take Stewart down to the interview room where Detective Brown and FBI Agent Andrews are waiting. At no point did Officer Phelps tell either Detective Brown or Agent Andrews that Stewart had invoked his right to remain silent and his right to counsel.

About six feet from the door to the interview room, Stewart saw one of the officers inside the interview room, and exploded again saying "I don't want to talk to you mother-fuckers." Officer Phelps told Stewart to "calm down, they're going to serve papers on you, and we'll deal with this calmly." Stewart stepped into the room, and began looking at FBI Agent Andrews who had introduced himself by showing Stewart his badge.

According to Detective Brown, "[a]s soon as the door opened [Stewart] looked at me and said he didn't want to talk to me, and he was very angry at me, and [FBI] Agent Andrew, who was standing next to me on my right, had his wallet out and was showing his him his credentials and introduced himself as an FBI agent. And [Stewart] immediately walked over to [FBI Agent Andrews] and began asking [FBI Agent Andrews] a bunch question about the bank." According to Detective Brown, Stewart began asking FBI Agent

U.S.C. § 1951.

Andrews if he really thought he did the bank robbery and several related questions.

According to FBI Agent Andrews, as Stewart "was entering [the interview room], he said something about not wanting to talk about the robberies or the Sonic robbery, and that's when I held up my badge and credentials and indicated that I was with the FBI, and Mr. Stewart started asking me questions about the bank robbery in Lawrence, which I was there to investigate, and I told him that we couldn't talk ... until we advised him of his rights."

Stewart was again advised of the *Miranda* warnings. Within fifteen minutes of entering the interview room, Stewart signed a written waiver of his *Miranda* rights, reaffirming his oral waiver. Stewart is informed that several of the items seized from his residence tie him to the Shark's Surf Shop robbery. During the next several hours, Stewart makes several incriminating statements regarding several robberies—robberies now charged in the indictment in this case. Stewart, in substantial detail, recounts the facts surrounding his robbery of the Shark's Surf Shop. Stewart also admits to either personally participating or planning other robberies. At the end of the interview, Stewart admits to the Topeka Sonic robbery. Stewart agrees to provide a written statement, but indicates that he is too tired to do so at that time. Detective Brown plans to return later that same day.

During the interview, Stewart is handed the letter from his mother. Detective Brown told Stewart that he would let him call his mother, "regardless of how this interview goes." However, a call could not be made on Detective Brown's cellular phone from inside the prison and no other phone was available in the interview room. Consequently, Stewart did not call to check on his mother until the next day.[5]

**5.** The court ascribes little if any significance to this particular series of events regarding the defendant's mother. The court does not

**September 6, 1998, around 3:30 in afternoon:**

Detective Brown returned to interview Stewart again and to obtain a written statement. Stewart is again provided the *Miranda* warnings. In his own handwritten confession, Stewart detailed in part his criminal acts and his motives for committing the crimes. The handwritten confession concludes with: "I also like to say MT Brown is very sharp and professional."

**September 8, 1998:**

Detective Brown attempts to conduct a follow-up interview with Stewart. Stewart unequivocally invokes his right to counsel and his right to remain silent. The interview is terminated.

### Analysis

As it turned out, and as the government concedes, the facts proffered by the government in its brief proved to be partially inaccurate. Moreover, neither the defendant's counsel nor the government's counsel were apparently aware of Detective Lowe's second interrogation of the defendant prior to the receipt of this memorandum and order. During oral argument, the government conceded that Stewart had in fact invoked his right to counsel and right to remain silent prior to the September 5, 1998, interview that began around 8:20 p.m. and that Officer Phelps' knowledge Stewart's invocation of his right to counsel is imputed to all law enforcement officers. However, the government contends that the defendant's *Miranda* rights have not been violated as it was the defendant, not law enforcement officers, who initiated the contact and ensuing conversation with FBI Agent Andrews on September 5, 1998. The government noted that after that initial encounter, the defendant was again advised of his *Miranda* rights and only then did he make the incriminating statements he now seeks to suppress.

believe that Detective Brown or Agent Andrews improperly used Stewart's mother's illness to gain improper leverage over Stewart.

In light of the court's factual findings, the defendant's motion to suppress essentially raises the following issues:

(1) Did one or more violations of *Miranda* or *Edwards* occur in this case?

(2) If a violation of *Miranda* occurred in this case, were the defendant's subsequent statements to law enforcement officers nevertheless voluntary?

## 1) Did one or more violations of *Miranda* or *Edwards* occur in this case?

*Detective Lowe's First and Second Interrogations:*

■ Although Detective Lowe's first interrogation of Stewart clearly comported with the rules established in *Miranda,* it is clear that Detective Lowe's second interrogation of Stewart—following Stewart's invocation of his right to remain silent-constituted a violation of *Miranda.* Other than the passage of approximately twenty minutes, nothing had occurred or otherwise developed which might have justified Detective Lowe's second interrogation of Stewart. Stewart did not initiate any conversation with Detective Stewart after invoking his right to remain silent. Detective Lowe essentially attempted to talk Stewart out his decision to remain silent before he was transported to jail. In short, the court finds Stewart's statements to Detective Lowe following the invocation of his *Miranda* rights to be the product of a *Miranda* violation. The court grants the defendant's motion to suppresses those statements; the government is precluded from using any of the statements elicited from Stewart by Detective Lowe (during the second interrogation) in its case-in-chief.

*Detective Browns' Interrogation:*

■ Despite Detective Lowe's failure to scrupulously honor Stewart's invocation of his right to remain silent, Detective Brown's initial interrogation of Stewart was not improper. Almost three hours after Detective Lowe's interrogation of Stewart, Detective Brown commenced an interrogation of Stewart at a different lo-cation. Prior to commencing that interrogation, Stewart is again advised of the *Miranda* warnings and expressly waives those rights. Detective Brown repeatedly indicated that he has no interest in the Sonic robbery and confined his interrogation solely to the Lawrence robberies. The substantial interval of time between interrogations, *see Mosley,* 423 U.S. at 104, 96 S.Ct. 321 (interval of more than two hours between end of first interrogation and beginning of second interrogation), the receipt of a fresh set of *Miranda* warnings, and the fact that subject of the second interrogation was unrelated to the first, convince the court that Detective Brown scrupulously honored Stewart's rights and that his interrogation was not improper.

*Detective Brown and FBI Agent Andrew's Interrogation:*

■ Although the defendant expressly invoked his right to counsel and his right to remain silent immediately before entering the interview room to meet with Detective Brown and FBI Agent Andrews, he immediately and unilaterally changed his mind about that decision by initiating a conversation with Agent Andrews. *See Miranda,* 384 U.S. at 478, 86 S.Ct. 1602 ("Volunteered statements of any kind are not barred by the Fifth Amendment."); *Glover,* 104 F.3d at 1581; *United States v. Muniz,* 1 F.3d 1018, 1022 (10th Cir.) ("If a person voluntarily speaks without interrogation by an officer, the Fifth Amendment's protection is not at issue, and the statements are admissible."), *cert denied,* 510 U.S. 1002, 114 S.Ct. 575, 126 L.Ed.2d 474 (1993). Stewart, not the law enforcement officers, opened a dialogue about the Lawrence bank robbery. Before talking about that crime, Stewart was again advised of his *Miranda* rights and this time waived them both orally and in writing. No violation of the defendant's right to counsel occurred in this case. *See Oregon v. Bradshaw,* 462 U.S. at 1046, 103 S.Ct. 2830.

**(2) If a violation of *Miranda* occurred in this case, were the defendant's subsequent statements to law enforcement officers nevertheless voluntary?**

 The fact that Detective Lowe's second interrogation of Stewart violated *Miranda* does not automatically require the suppression of all of Stewart's subsequent statements to other law enforcement officers. Although Detective Lowe's second interrogation violated *Miranda,* it is possible that Stewart's subsequent statements are nevertheless voluntary. *See, e.g., Jacobs v. Singletary,* 952 F.2d 1282 (11th Cir.1992). For that matter, even if the defendant's first statements to law enforcement officers were found to be involuntary, even then his subsequent statements may nevertheless be admissible. *See United States v. Perdue,* 8 F.3d 1455, 1467 (10th Cir.1993) ("When the defendant's first statements are found to be involuntary, the appropriate inquiry in determining the admissibility of [the defendant's subsequent statements to law enforcement officers] is whether the 'coercion surrounding the first statement had been sufficiently dissipated so as to make the second statement voluntary.'") (*quoting Leon v. Wainwright,* 734 F.2d 770, 772–73 (11th Cir.1984)) (*citing Darwin v. Connecticut,* 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968), and *Leyra v. Denno,* 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954)). *See Oregon v. Elstad,* 470 U.S. 298, 307, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) ("When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession.") (*citing Westover v. United States,* decided together with *Miranda v. Arizona,* 384 U.S., at 494, 86 S.Ct., at 1638; *Clewis v. Texas,* 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967)).

In this case, the court finds that Stewart's statements to Detective Brown on September 4, 1998, to Detective Brown and FBI Agent Andrews on September 5–6, 1998, and his written and oral statements to Detective Brown on September 6, 1998, were the product of a knowing and intelligent waiver of his right to remain silent and his right to counsel. *See Oregon v. Bradshaw,* 462 U.S. at 1046, 103 S.Ct. 2830 (If there was no violation of *Edwards,* " 'whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.' ") (*quoting Edwards,* 451 U.S. at 486 n. 9, 101 S.Ct. 1880). Prior to making any of the incriminatory statements the government intends to offer at trial from those interviews, Stewart was advised of his *Miranda* rights. That Stewart understood those rights is in part evidenced by the fact that he knew how to invoke those rights and did so on more than one occasion. The person(s) conducting the interrogations on those three occasions were not the person(s) who had ignored his invocation of his right to remain silent regarding an unrelated crime. A substantial interval of time—almost three hours- had passed between the Detective Lowe's interview and Detective Brown's first interview. Detective Lowe's interview occurred at a different location than Detective Brown's interview. The subsequent interviews conducted by Detective Brown and Agent Andrews occurred on the days that followed. At no point during his first interview did Detective Brown attempt to interrogate Stewart about the Sonic robbery—the crime to which the defendant specifically indicated he did not want to talk about.

In sum, the substantial interval of time between interrogations, the change in location and in the identity of the interrogating officers, the receipt of a fresh set of *Miranda* warnings before each interrogation, and the fact that the subject of the second and subsequent interrogations were unrelated to the first interrogation (until Stew-

art confessed to the Sonic robbery on September 6, 1998), convince the court that Detective Brown and Agent Andrews' interrogation of Stewart was not improper and that his statements to those law enforcement officers were the product of his knowing waiver of his rights. The court concludes that the government has sustained its burden of proving that Stewart's waiver (albeit improvident to his defense) of his right to remain silent and his right to counsel regarding his statements to Detective Brown and Agent Andrews was the product of his free and deliberate choice rather than intimidation, coercion, or deception by law enforcement officers and that his waiver was made in full awareness of the nature of the rights being waived and the consequences of having waived them. The court also finds that under the totality of the circumstances Stewart's incriminatory statements during his interviews with Detective Brown and Agent Andrews were voluntary. The defendant's motion to suppress these statements is denied.

## 2. Government's "Motion to Compel Giving of Hair Sample" (Dk.18).

During his confession, the defendant admitted to committing a series of robberies including the robbery of the Lawrence Pizza Co. Two bandanas were found at the scene of the robbery of the Lawrence Pizza Co. According to the government's motion, one bandana contained the hair of a "Caucasian person, and in the other is hair of a black person. This matches the description of the robbers of the Lawrence Pizza, Co." The government asks the court for an order compelling the defendant to submit a sample of his hair to perform a comparison with the hair found in one of the bandanas.

In his one page response, the defendant opposes the government's motion, arguing that the only reason that the government knew about his connection to the Lawrence Pizza, Co. was through his confession that he seeks to suppress. Apparently advancing a "fruit of the poisonous tree" argument (albeit not by name), the defen-

dant "objects to giving hair sample prior to the Court's ruling on Defendant's motion to suppress" his confession.

The court grants the government's motion to compel a hair sample from the defendant. Although the court suppresses the statements Stewart made to Detective Lowe following his invocation of his right to remain silent, the court finds all of Stewart's statements to Detective Brown and FBI Agent Andrews to be the product of a knowing, voluntary waiver of his right to remain silent and his right to counsel. Because Stewart's statements regarding the robbery of the Lawrence Pizza Co. are voluntary, there is no basis to preclude the government from obtaining the hair sample it seeks. *Cf. United States v. Elie*, 111 F.3d 1135, 1140 (4th Cir.1997) (derivative evidence discovered by means sufficiently distinguishable from the illegal arrest, search or interrogation to be purged from the primary taint are admissible). The government's "motion to compel giving of hair sample" is granted.

IT IS THEREFORE ORDERED that the defendant's "Motion to Suppress" (Dk.15) is granted in part and denied in part as set forth in the body of this opinion.

IT IS FURTHER ORDERED that the government's "Motion to Compel Giving of Hair Sample" (Dk.18) is granted.