**Jerry Lee ROBINSON, Petitioner,**

v.

**James P. TRAST, et al., Respondents.**

**No. 98–3026–DES.**

United States District Court,
D. Kansas.

Jan. 4, 2001.

David J. Gottlieb, Jean K. Gilles Phillips, University of Kansas, School of Law, Lawrence, KS, for Jerry Lee Robinson.

Jared S. Maag, Office of Atty. Gen., Topeka, KS, for James P Trast, Attorney General of Kansas.

### MEMORANDUM AND ORDER

SAFFELS, District Judge.

This is a petition for writ of habeas corpus, 28 U.S.C. § 2254, filed by petitioner while he was an inmate of the Topeka Juvenile Correctional Facility, Topeka, Kansas. Robinson was convicted in 1995 by a jury in Franklin County District Court, Ottawa, Kansas, of depraved heart second-degree murder for killing a man by striking him in the head with a golf club. The trial judge granted Robinson's motion for a downward departure from a maximum of 77 months to a sentence of 55 months based on Robinson's young age and the fact that the victim was the initial aggressor. Robinson appealed the conviction which was affirmed by the Kansas Supreme Court, *State of Kansas v. Robinson*, 261 Kan. 865, 934 P.2d 38 (1997). No state post-conviction motion was filed. A Memorandum of Law in support of the Petition was filed on behalf of petitioner by the Paul E. Wilson Defender Project, University of Kansas School of Law. An Order to Show Cause was issued, and respondent filed an Answer and Return attaching the transcripts and records of the state criminal proceedings. Having considered all the materials filed, the court makes the following findings and Order.

### FACTS

The facts are summarized from the opinion of the Kansas Supreme Court. The

victim, Richard Crowley, "was clearly the initial aggressor in this case." *Robinson*, 261 Kan. at 865, 934 P.2d 38. Crowley was upset because he felt police were not responding to incidents in which his sons had been threatened by Jeremy Hendrickson and his friends. Crowley drove to a park in Ottawa looking for Hendrickson and spotted him, Eddie Carter, Tony Surber and Robinson. He did not know the boys, but Hendrickson identified himself. Crowley yelled at Hendrickson to leave his sons alone, and spit in his face. An altercation followed with Crowley hitting Surber in the face, Surber displaying a knife, and Crowley chasing the boys with a metal baseball bat he took from his car. The boys grabbed golf clubs from a car, began chasing Crowley and surrounded him. They taunted him and swung their clubs at him, while Crowley defended himself with the bat. Witnesses driving in the park testified at trial. One testified he saw Surber hit Crowley in the back with a golf club. Crowley then chased Surber, who tripped and fell to the ground, where Crowley hit him twice with the bat. Another witness testified that Crowley had turned away from Surber, and that Surber had begun to get up, when Robinson fatally struck Crowley in the head with his golf club. However, Surber testified he was still on the ground when Robinson struck the fatal blow. Robinson testified that he was not aiming at Crowley's head, but only intended to make him stop hitting Surber. The club stuck in Crowley's head, and he fell to the ground. Robinson ran home. Crowley died shortly thereafter due to the blow to his head. After several law enforcement officers arrived at the park, Robinson, accompanied by his mother and her boyfriend, returned to the park, approached officers and told his version of the incident. At trial there was conflicting evidence as to how seriously the boys and even the victim were taking the "jousting;" whether or not Crowley attempted to withdraw or only asked passersby for assistance; and whether or not Surber was on the ground being hit or about to escape when defendant struck the fatal blow. The jury had to judge the credibility of the various witnesses. As the judge opined, "the key issue for this jury is going to be whether they find the (defendant's) conduct was culpable enough to constitute recklessly, under circumstances showing extreme indifference to the value of human life." Trial Transcript (hereinafter "T.") at 295.

## CLAIMS

Robinson claims that his trial was fundamentally unfair because the court admitted a videotaped interview allegedly obtained in violation of his Fifth Amendment right to remain silent, and the prosecutor argued improperly in closing that Robinson was a gang member.

## GENERAL HABEAS STANDARDS

Robinson filed the present habeas petition in 1998. The provisions of section 2254 as they were amended by the Anti Terrorism and Effective Death Penalty Act (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214 (1996), therefore apply to this review. *Thomas v. Gibson*, 218 F.3d 1213, 1219 (10th Cir.2000). Section 2254(d) under AEDPA provides that a writ of habeas corpus may not be issued with respect to any claim adjudicated on the merits in state court unless that adjudication:

> (1) ... was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) ... was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d)(1)-(2). Petitioner's claims were both heard on the merits in state court.

The Supreme Court recently construed the review standard set forth in subsection (d)(1), and the Tenth Circuit summarized that review as follows. *See Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Valdez v. Ward*, 219 F.3d 1222, 1229–30 (10th Cir.2000). When applying subsection (d)(1), the Supreme

Court stated the threshold inquiry is whether the petitioner seeks to apply a rule of law that was "clearly established" by the Supreme Court at the time the conviction became final. *See Williams,* 120 S.Ct. at 1511. If so, the court must proceed to a bifurcated inquiry. *See id.* at 1519. The court must first determine whether the state court's decision was contrary to clearly established federal law. The "contrary to" clause of subsection (d)(1) is implicated in two circumstances. *Id.* The circumstance relevant to this case is where the state court is confronted with a set of facts which are "materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Id.* at 1519–20. The reviewing court next asks whether the state court's determination involved an unreasonable application of clearly established federal law. *See id.* at 1520. The "unreasonable application" clause of subsection (d)(1) applies in two scenarios. The one relevant here is where the "state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case...." *Id.* In either of the two scenarios the reviewing habeas court must determine whether the state court's application of Supreme Court precedent to the case at bar was "reasonable." *See id.* at 1521–22.

The Court refrained from defining the term "reasonable" as it is used in AEDPA, other than to note that while it is "difficult to define," it is "a common term in the legal world and, accordingly, federal judges are familiar with its meaning." *Id.* at ——, 120 S.Ct. at 1522. The Court did instruct that the reasonableness determination is an objective inquiry, not a subjective one. *See id.* at ——, 120 S.Ct. at 1521–22. Thus, the fact that one court or even a few courts have applied the precedent in the same manner to close facts does not make the state court decision "reasonable."

■ *Valdez,* 219 F.3d at 1230. Under the "unreasonable application" clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable. *Williams,* 120 S.Ct. at 1522.

■ The state court's legal conclusions are reviewed de novo. *See Valdez,* 219 F.3d at 1230, [*citing Rogers v. Gibson,* 173 F.3d 1278, 1282 (10th Cir.1999), *cert. denied,* 528 U.S. 1120, 120 S.Ct. 944, 145 L.Ed.2d 820 (2000) ]. Section 2254(e)(1) requires a habeas court to presume that factual determinations made by the state court are correct, and places the burden on the petitioner to rebut that presumption by clear and convincing evidence. This court proceeds to review Robinson's claims with these standards in mind.

## CONFESSION

The court first considers Robinson's claim that his videotaped statements were obtained in violation of his right to remain silent and should not have been admitted at trial. This claim is premised on the Supreme Court decision in *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Robinson is asserting that the state court's ruling was "contrary to" or an "unreasonable application" of this "clearly established" Supreme Court precedent. Thus, this court must determine whether or not the state court's application of *Mosley* was reasonable.

In *Mosley,* the Supreme Court addressed whether a resumption of questioning is permissible after a person in custody has invoked his right to remain silent. *Id.* at 101, 96 S.Ct. 321. The Court indicated that the resolution of this issue was governed by the following passage from *Miranda:* "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at

100, 96 S.Ct. 321 [*quoting Miranda v. Arizona*, 384 U.S. 436, 473–74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ]. In *Miranda*, the Supreme Court promulgated a set of safeguards to protect the constitutional rights of persons subjected to custodial interrogation. In sum the Court held that unless law enforcement officers give specified warnings before questioning a person in custody, and follow specified procedures during interrogation, any statement made cannot be admitted in evidence at trial, even though the statement may in fact be voluntary. *Mosley*, 423 U.S. at 99–100, 96 S.Ct. 321 [*citing Michigan v. Tucker*, 417 U.S. 433, 443, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974) ]. The *Mosley* court interpreted *Miranda* as intending to adopt "fully effective means ... to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored...." *Miranda*, 384 U.S. at 479, 86 S.Ct. 1602. The court identified the "critical safeguard" as a person's "right to cut off questioning." *Id.* at 474, 86 S.Ct. 1602. "To determine whether a suspect's right to cut off questioning was 'scrupulously honored,' *Mosley* established a multi-factor test that includes an inquiry into the amount of time that lapsed between interrogations; the scope of the second interrogation; whether new *Miranda* warnings were given; and the degree to which police officers pursued further interrogation once the suspect had invoked his right to silence." *United States v. Stewart*, 51 F.Supp.2d 1136, 1141 (D.Kan.1999)[*citing United States v. Schwensow*, 151 F.3d 650, 658 (7th Cir.1998)(*citing Mosley*, 423 U.S. at 104–05, 96 S.Ct. 321) ]. Officers in *Mosley* were allowed to reinitiate questioning because: (1) at the time the defendant invoked his right to remain silent, the questioning ceased; (2) an interval of "more than two hours" passed before the second interrogation, (3) which took place at another location; (4) the defendant was given a fresh set of *Miranda* warnings; and (5) the subject of the second interrogation was an unrelated crime. *See Mosley*, at 104–105, 96 S.Ct. 321; *United States v. Glover*, 104 F.3d 1570, 1580 (10th Cir.1997). The *Mosley* court emphasized that no passage in the *Miranda* opinion can be sensibly read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent.

*Mosley*, 423 U.S. at 102–03, 96 S.Ct. 321. The Supreme Court in *Mosley* did not read *Miranda* either in a way that prohibited all subsequent interrogation once a suspect invoked the right to silence, or in an way that permitted a resumption of questioning after only a momentary respite.

As noted, Robinson was first briefly interviewed as a witness at the scene. He was later picked up and taken to the police station where Detective Geist and KBI Agent Hawel questioned him in an interrogation room. His mother and her long-term live-in boyfriend, Tony Jennings, were present. Before questioning was initiated at the station, Robinson was fully re-advised of his rights under *Miranda;* and he and Mr. Jennings signed a consent form. The last sentence read from the consent form to Robinson and Jennings was, "I understand a permanent tape recording may be made of this interview at the officer's discretion."

The tape of the interview indicates that the consent form was signed at 7:39 p.m. Interrogation was finished for the most part before 9:00 p.m. when the agents left to prepare and execute a consensual search warrant. The entire interview was recorded on videotape.[1]

During this videotaped interview, Robinson made several incriminating statements. In particular, he repeatedly said

---

1. Approximately half of the videotape consisting of a conversation between Robinson and Jennings and statements made without the officers present in the interrogation room was excluded by the court prior to trial.

that he swung the golf club and hit the victim, that the club stuck in the victim's head, and that he ran after he saw blood squirting from the victim. The interview portion of the tape was admitted in evidence and viewed by the jury at trial. Robinson argues that the introduction of the tape was a per se violation of *Miranda,* had a substantial and injurious effect on the jury, and was very prejudicial because of its content, vividness and length. He describes it as showing him acting bored, detached, and disinterested as well as lacking emotion and remorse. He contends that his claim of prejudice is supported by the fact that the trial judge relied on the tape as evidence of extreme recklessness [2] in denying his motion to dismiss at the end of the State's case.

Robinson does not claim that he is not guilty of killing the victim. Instead, he claims that he should have been convicted of the lesser offense of involuntary manslaughter, not depraved heart second degree murder. He further asserts that the jury relied upon the tape to find the element of extreme indifference to the value of human life necessary to convict of the greater offense. Thus, Robinson is claiming error as to degree of recklessness only. As legal authority, Robinson alleges that crucial *Mosley* factors are not present in this case in that interrogation was reinitiated by police only one hour after he invoked his right to remain silent [3] and he was questioned as to the same crime.

The trial court conducted a suppression hearing to determine voluntariness. The judge properly opened the hearing by noting that the State bears the burden in a suppression hearing to show by a preponderance of the evidence that a confession is knowing and voluntary. *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). After correctly citing *Mosley* in a journal entry ruling on defendant's motion to suppress, the trial judge discussed the facts. *State of Kansas v. Robinson,* 94–CR–490 (D. Ct. Franklin Co., Ks., Feb. 3, 1995)(Rec. at 83). The court found that Robinson did invoke his right to silence during the first interview with Davis, and that "Captain Davis immediately ceased questioning, thus complying with Miranda." Rec. at 87. The judge concluded, "Given the fact that the defendant was not in custody (during the initial investigative interview in the park), and the subsequent interrogation by Geist and Hawel occurred approximately an hour after the statement to Davis, it was an appreciable cessation of interrogation and under the totality of the circumstances, it was proper." Rec. at 88.

This court has thoroughly reviewed the record as to circumstances leading to the challenged confession. When Robinson's mother informed Davis that her son did not want to answer any more questions, Davis immediately ceased the interrogation and did not try either to resume or in any way to persuade Robinson to reconsider his position. After an interval of over an hour, Robinson was questioned by another police officer at another location, but about the same crime. The record mainly reveals that Robinson, when

---

2. The judge stated: "The circumstances showing extreme indifference to the value of human life ... are shown by all the evidence thus far presented by the State, including the defendant's own statement in the videotape ..." and "the weapon of choice." T. at 295–96. The judge had noted in ruling on a pretrial motion to dismiss: "Striking at Mr. Crowley's head with a metal golf club would certainly seem to satisfy the element of extreme indifference to the value of human life...." Criminal Case Record (hereinafter "Rec.") at 93.

3. This case does not involve the procedures to be followed if the person in custody requests an attorney which requires that questioning cease until an attorney is present. *See Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Facts indicating that Robinson's mother may have asked her boyfriend in front of an investigating officer whether they should consult an attorney do not amount to an unambiguous request for counsel, and Robinson does not make the claim in this habeas action that he invoked his right to an attorney.

initially advised of his rights, chose to exercise his right to control the time and place at which questioning occurred. Before the interrogation at the police station, Robinson was carefully advised that he was under no obligation to answer any questions and could remain silent if he wished. He was given full and complete *Miranda* warnings, orally acknowledged that he understood the warnings, and signed a printed notification-of-rights form. He was thus given a full and fair opportunity to exercise these options and had seen the invocation of his right to silence cut off questioning earlier. Robinson, his mother, and Mr. Jennings did not appear to be at a disadvantage due to a lack of education, intelligence or mental capacity.

Although it is a difficult question, this court is of the opinion that the finding of the trial judge and the majority of the Kansas Supreme Court that the interrogation of Robinson at the police station was not in violation of *Mosley* is not unreasonable. There is only one specific factor relied upon in the *Mosley* case which is completely absent here-a difference in crimes about which the defendant was questioned. It is clear that every one of the specified factors relied on in *Mosley* does not have to be present in order to legitimize a resumption of questioning. *See discussion and cases cited in People v. Quezada,* 731 P.2d 730, 733–34 (Colo.1987). It is also clear that no particular factor is dispositive. There is no prevailing authority holding that *Mosley* cannot reasonably apply in a case where the one factor of different crimes is absent. *Cf. United States v. Finch,* 557 F.2d 1234 (8th Cir.) *cert. denied,* 434 U.S. 927, 98 S.Ct. 409, 54 L.Ed.2d 285 (1977). Moreover, the factors in *Mosley* are not exhaustive, but are to be considered along with any others bearing on whether the police fully respected the suspect's right to cut off questioning. From its own review, this court finds all but one *Mosley* factor here as well as additional factors not present in *Mosley* which reasonably support the denial of suppression in this case.

■ A factor not present in *Mosley* which weighs against suppression in this case is that one might even question whether Robinson effectively waived his right to remain silent since it does not appear that he was in custody when he was questioned by Davis in the park. In *United States v. Bautista,* 145 F.3d 1140, 1147 (10th Cir.) *cert. denied,* 525 U.S. 911, 119 S.Ct. 255, 142 L.Ed.2d 210 (1998), the Tenth Circuit held that in order to implicate the Miranda–Edwards right to counsel prophylaxis, both a custodial situation and official interrogation are required. Absent either, *Miranda* and *Edwards* are not implicated. It should be no different for the Miranda–Mosley right to silence prophylaxis. The state trial court found that Robinson was not in custody during the initial interrogation, and there is support for this ruling in the record. Robinson had not been arrested or deprived of his freedom at the time his mother commented that he did not want to answer further questions. Giving a *Miranda* warning does not, in and of itself, convert an otherwise non-custodial interview into a custodial interrogation, but is a factor to be considered by the court. *Bautista,* 145 F.3d at 1148. It is not dispositive that the officers believed Robinson was not in custody or that Robinson believed he was. *Id.* at 1149. One cannot effectively invoke one's right to remain silent in advance of a custodial interrogation. It is not an anticipatory right. *See id.* at 1151. It would be closer to a violation of *Mosley* if the first interrogation had been custodial rather than an investigatory interview.

■ If Robinson was not in custody at the park during his questioning by Davis and his attempt to invoke his right to remain silent was ineffective, (*See Bautista,* 145 F.3d at 1140), then this court must be concerned with whether he voluntarily and knowingly waived his rights at the police station prior to the taped interview. The court has no doubt that he did. The

validity of a *Miranda* waiver must be resolved on the basis of the totality of circumstances surrounding the custodial interrogation. *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410, (1986). A waiver is voluntary if the totality of circumstances demonstrates that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception and it was made in full awareness of the nature of the rights being waived and the consequences of waiving. In *Glover,* 104 F.3d at 1579, the Tenth Circuit set forth the appropriate inquiry for determining the voluntariness of a defendant's statements:

> In determining whether a particular confession is coerced, we consider the following factors: (1) the age, intelligence, and education of the defendant; (2) the length of the detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of her constitutional rights; and (5) whether the defendant was subjected to physical punishment.

Here, Robinson does not even challenge the validity of his waiver of the rights protected by *Miranda.* There is absolutely no evidence or allegation of any efforts by law enforcement officers to wear down Robinson's resistance so that he would change his mind and talk. *See Glover,* 104 F.3d at 1582. At the police station, he was re-advised of his Miranda rights, and the agents had finished taking his statement after about ninety minutes. There is no indication that the agents intimidated, coerced, or deceived Robinson at any stage of this process, and the tape demonstrates otherwise. Based on the totality of the circumstances, this court holds that Robinson voluntarily and knowingly waived his Miranda rights at the police station.

If, on the other hand, as Robinson argues, the non-custodial, investigative interview at the park became a custodial interrogation when Davis read Robinson his *Miranda* rights, with the result that Robinson effectively invoked his right to remain silent, *Mosley* applied. In this case, *Miranda* warnings were given in response to the officer's belief that Robinson had said something incriminating. Thus, it would be at this point that the interview became custodial. It is undisputed that Robinson's mother[4] stated that he did not wish to answer any more questions. Davis recognized the mother's statement as invoking Robinson's *Miranda* right to silence and immediately ceased asking questions. Consequently, there was a break in custody or an intervening time without questioning. Robinson was re-advised of his rights when questioning resumed. A different officer resumed questioning Robinson, albeit about the same crime on which questioning had been cut off. The officers at the police station were unaware of and did not discuss Robinson's prior invocation of his right to remain silent.[5] The trial court evidently found that these circumstances demonstrated Robinson's intent to revoke his earlier exercise of the right to remain silent.

■ In the instant case, there is no badgering alleged. *Mosley* is premised on the inherently coercive nature of custodial interrogation and is designed to prevent the authorities from badgering a suspect in custody from the time he invokes his right to the time when the subsequent interrogation is initiated. *See Bautista,* 145 F.3d at 1147 *[citing McNeil v. Wisconsin,* 501 U.S. 171, 177, 111 S.Ct. 2204, 115 L.Ed.2d 158, (1991) ]. If custody is broken, the inherently coercive nature of custody itself is diminished and there is little to no risk

---

4. The invocation of Robinson's right to remain silent was not ineffective, as the State argued to the trial judge, because it was made by his mother.

5. Agent Geist's claim that he had no knowledge Robinson had invoked his right to remain silent is not dispositive since once a suspect has invoked a *Miranda* right, knowledge of that request is imputed to all law enforcement officers who subsequently deal with the suspect. *See United States v. Scalf,* 708 F.2d 1540, 1544 (10th Cir.1983).

718

of badgering by the authorities. Whether a break in custody is sufficient to remove a suspect's invocation of his right to remain silent from *Mosley* must also be evaluated under the totality of the circumstances. *Cf. Bautista,* 145 F.3d at 1150. This court finds that the totality of the circumstances supports the ruling of the trial court that there was "an appreciable cessation" of questioning which prevented badgering.

Another factor the court considers significant in this case is that the confessions by Robinson on tape are not the main target of his challenge. Robinson seemingly objects to the interrogation room tape, not so much because of his confessional statements, but because of his demeanor. He complains that the tape shows him bored, detached and lacking emotion and remorse. He further complains he was not informed he was being taped and that admission of the tape was error because its "content, vividness and length" had an "injurious effect on the trial."

■ In the first place, contrary to Robinson's allegations, the tape shows that he was orally informed he could be videotaped,[6] and he signed a card acknowledging that warning in writing. Secondly, Robinson had no right to privacy nor other right not to be videotaped while in custody at the police station. Furthermore, an interrogating officer could have properly testified in court as to his demeanor during questioning at the police station, so there is no rationale for holding that taped evidence of his demeanor is inadmissible.

Most importantly, even if admission of the videotape could be deemed a violation under *Mosley,* this court completely agrees with the state courts' findings and ultimate conclusion that admitting the statements made by Robinson which were taped at the police station was harmless error. *See Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972). This is so because the same inculpatory statements were made at the investigative interview and at trial, and were supported by other testimony. Moreover, this court viewed the tape and did not find Robinson's demeanor during the portion shown to the jury to be so lacking in remorse and detached that it must have had a substantial, prejudicial effect on the jury.

For the foregoing reasons, the court concludes that the state courts' application of *Mosley* to this case was not unreasonable, and that petitioner is not entitled to habeas corpus relief under 28 U.S.C. § 2254(d) on this claim.

## IMPROPER PROSECUTORIAL REMARKS

Petitioner's second claim is that in closing, the prosecutor argued over sustained objections that Robinson was a member of a gang. Petitioner alleges that these comments were not supported by any evidence and were intended to inflame the jury. The court finds the following comments in the transcript of the closing arguments. First, the prosecutor referred to "Jeremy Hendrickson's gang, the Posse" as having had an altercation with the victim's boys. Transcript of Closing, at 10. He next stated that the victim went looking for "that Jeremy Hendrickson gang" and that he "confronted Jeremy Hendrickson and his gang." *Id.* at 11. He asked if the victim should have died for "confronting these four young Jeremy Hendrickson gang guys?" *Id.* at 12. After these comments, defense counsel objected that there was no proof that defendant is a member of any gang. *Id.* The court sustained the objection and admonished the jury to disregard the remarks. *Id.* The prosecutor once more stated: "It is a group, Your Honor. It is a gang," in response to a defense objection to his remark that the victim was mad "they were beating up his boys." *Id.* at 16. Thereafter, the prosecu-

6. The excluded portion of the tape viewed by this court shows that while the agents were out of the room, the family discussed the possibility that a camera could be taping them from behind the mirrored windows.

tor stated that a couple of the witnesses delayed coming forth because they "were scared ... they know who Jeremy Hendrickson and those guys are." The defense objected to "those guys." The court stated, "I will sustain the objection and instruct the jury that they should not base their decision in this case ... on any inference that the defendant was a member of some organized gang." *Id.* at 30. Robinson claims that these remarks "severely incited and prejudiced the jury" so that his right to a fair trial was violated.

■■■■ A prosecutor's improper comment or argument will require reversal of a state conviction only where the remarks sufficiently infect the trial so as to make it fundamentally unfair and, therefore, a denial of due process. *Boyd v. Ward,* 179 F.3d 904, 920 (10th Cir.1999), *cert. denied,* 528 U.S. 1167, 120 S.Ct. 1188, 145 L.Ed.2d 1093 (2000)[*citing Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) ]. Inquiry into the fundamental fairness of a trial can be made only after examining the entire proceedings. See *Donnelly,* 416 U.S. at 643, 94 S.Ct. 1868.

■■■■ Trial error is amenable to harmless-error analysis because it "may ... be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial]." *Brecht v. Abrahamson,* 507 U.S. 619, 629, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)[*quoting Arizona v. Fulminante,* 499 U.S. 279, 307–08, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) ]. In the case of "trial errors" before a federal habeas court, the *Brecht* Court held that the *Kotteakos* standard, rather than the *Chapman* harmless error standard, is applicable. *Id.* at 637, 113 S.Ct. 1710. Under the *Kotteakos* standard, the test is whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 637, 113 S.Ct. 1710 [*quoting Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) ]. In *O'Neal v. McAninch,* 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995), the Supreme Court clarified that "[w]hen a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win." *Id.* at 994.

■■■■ Defense counsel moved for a new trial, alleging these comments implying Robinson was in a gang that had beaten up Crowley's sons were highly improper and prejudicial. *Robinson,* 261 Kan. at 890, 934 P.2d 38. The trial judge, in analyzing this issue, stated that there was "no evidence" that Robinson was a member of a gang or that anyone had beaten up Crowley's son. He enunciated the correct legal standard: "improper remarks of the prosecutor are grounds for reversal and a new trial only when they are so gross and flagrant as to prejudice the jury against the defendant and to deny the defendant a fair trial." *Id.* at 891, 934 P.2d 38. He also correctly stated that if there is constitutional error, it is subject to a harmless error analysis. He then made findings that the "prosecutor's remarks in this case were not so gross and flagrant as to deny Mr. Robinson a fair trial" and that any error he may have made in instructing the jury "did not contribute to the jury's verdict." *Id.* at 890–91, 934 P.2d 38.

The issue was also raised and argued on direct appeal. The Kansas Supreme Court found there was "no evidence that the killing of Crowley was related to street gang activity in any way." After discussing the arguments and the record before it, the court reasoned that the prosecutor "must abide by the evidence and refrain from speech designed to inflame or prejudice the jury," but such "error may be cured by a trial court's admonition to the jury that it disregard a prosecutor's prejudicial statements." *Robinson,* 261 Kan. at 892, 934 P.2d 38. The court further reasoned that in "deciding whether improper remarks by the prosecution during closing

argument constitute harmless error, the reviewing court must be able to find that the error had little, if any, likelihood of changing the result," and that "such belief must be declared beyond a reasonable doubt." *Id.* The court held that the comments were in error, especially those made after Robinson's objection was sustained. However, they held that the comments were harmless error. The reasons relied on were: the trial judge instructed the jury to disregard the comments and there was no reason to believe the jury was unable to abide by the court's admonition; Robinson admitted that he killed Crowley by hitting him in the head with a golf club making the only question for the jury whether Robinson acted in self-defense, with recklessness, or with extreme recklessness; the jury found Robinson acted with extreme recklessness which was supported by the evidence from the State's medical expert[7] and other testimony; and that the gang comments amounted to just a few words out of a four day trial. *Id.* at 892–893, 934 P.2d 38. The Kansas Supreme Court concluded it was clear beyond a reasonable doubt that the improper gang comments had little, if any, likelihood of changing the result of the trial. *Id.* at 893, 934 P.2d 38.

This court's review of the entire proceedings has convinced it that the state courts reasonably resolved the merits of this claim. The objected-to comments, although improper, were not significant enough to influence the jury's decision in light of the strong evidence of guilt. The trial judge admonished the jury to disregard the remarks, stating they were not supported by evidence. There is no indication that the jury was unable to follow his admonition. Moreover, the defense as well as the prosecuting attorneys had asked questions eliciting mention of possible gang action during the trial. *See* T. at 37–41, 682–84. The court finds that there is no reasonable probability that the outcome of this trial would have been different without the improper remarks made in closing. For all the foregoing reasons, the court finds that Robinson is not entitled to habeas corpus relief.

IT IS THEREFORE BY THE COURT ORDERED that this action is dismissed and all relief denied.

---

7. The doctor who performed the autopsy testified that the golf club had gone through muscle, bone, an artery and part of the brain. T. at 263–64, 266.