COMMONWEALTH *vs.* DAVID BRUM.

Bristol. March 8, 2002. - November 8, 2002.

Present: MARSHALL, C.J., GREANEY, SOSMAN, & CORDY, JJ.

*Constitutional Law,* Admissions and confessions, Waiver of constitutional rights, Confrontation of witnesses. *Evidence,* Admissions and confessions, Hearsay, Corroborative evidence, Impeachment of credibility. *Waiver. Practice, Criminal,* Mistrial, Argument by prosecutor, Instructions to jury, Capital case. *Felony-Murder Rule.*

In a criminal case in which the defendant contended that the judge erred in denying his motion to suppress because his invocation of his right to cut off questioning at the end of a first interview was not "scrupulously honored" when the police sought to interrogate him again after his later arrest, the defendant's postarrest statement to police was properly admitted in evidence, where the initial interview of the defendant was not conducted during a custodial interrogation; where, regardless of the nature of the initial interrogation, it was undisputed that the defendant was released prior to his later arrest; and where the defendant voluntarily, knowingly, and intelligently waived his Miranda rights at the outset of the postarrest interview. [108-113]

At a criminal trial, the judge did not err in refusing to declare a mistrial after a prosecution witness testified to a remark the defendant made after he had invoked his right to terminate police questioning, where the statement was a spontaneous remark by the defendant, not the product of any violation of his rights, and where the judge's forceful instruction to disregard evidence of that statement gave the defendant more than that to which he was entitled. [113-116]

At a criminal trial, there was no error in the judge's admitting in evidence portions of a statement made by the nontestifying codefendant, which the defendant contended constituted inadmissible hearsay and violated his right of confrontation, where the portions were offered by the prosecutor not for their truth, but rather to show that the defendant and the codefendant had given identically false accounts of the same precise details. [116-118]

At a murder trial, the prosecutor's remarks in her closing argument referring to the defendant's alleged failure to remember what he had argued about with the victim about before choking him were not improper, but merely a resort to brief sarcasm to point out the absurdity of the defendant's claimed inability to remember the subject of his argument with the victim. [118-119]

At a murder trial, the judge did not err, in the circumstances, in refusing to instruct the jury on felony-murder in the second degree with larceny from the person as the predicate felony. [119-120]

This court declined to grant relief to the defendant under G. L. c. 278, § 33E,

to reduce his degree of guilt or to grant him a new trial where, although the prosecutor's references to the defendant's invocation of his right to remain silent were improper, the references did not give rise to a substantial likelihood of a miscarriage of justice [120-122], and where, although the judge included an erroneous description of the burden of proof on voluntary manslaughter, there was no evidence warranting a voluntary manslaughter instruction, and therefore no likelihood of a miscarriage of justice stemming from the error [122].

INDICTMENTS found and returned in the Superior Court Department on August 27, 1997.

A pretrial motion to suppress evidence was heard by *Raymond J. Brassard*, J., and the cases were tried before him.

*Terry Scott Nagel* for the defendant.

*M. Catherine Huddleson*, Special Assistant District Attorney, for the Commonwealth.

SOSMAN, J. The defendant was convicted of murder in the first degree, as both a joint venturer and a principal, on the theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder (with armed robbery as the predicate felony).[1] On appeal, he claims error in (1) the admission of his postarrest statement to the police, (2) the judge's denial of his motion for a mistrial after a prosecution witness testified to a remark the defendant made after he had invoked his right to terminate police questioning, (3) the admission of portions of a statement made by the nontestifying codefendant, (4) improper closing argument by the prosecutor, and (5) the refusal to instruct the jury on felony-murder in the second degree with larceny from the person as the predicate felony. The defendant also asks that we exercise our power under G. L. c. 278, § 33E, to reduce his degree of guilt or grant him a new trial. We affirm the convictions, and decline to exercise our power under G. L. c. 278, § 33E.

1. *Facts.* The facts viewed in the light most favorable to the

---

[1]He was also convicted of armed robbery. That conviction is not duplicative because the jury also convicted him on the theories of deliberate premeditation and extreme atrocity or cruelty. "Where the jury specify an alternate theory, in itself sufficient to support a conviction of murder in the first degree, the underlying felonies are considered separate and distinct crimes." See *Commonwealth* v. *Jackson*, 428 Mass. 455, 467 (1998).

Commonwealth are as follows. The seventy-nine year old victim owned a sewing machine repair shop in Fall River. The defendant and his twin brother, John Brum,[2] lived in their grandmother's house, near the victim's repair shop. From time to time, the victim had employed the two brothers to move heavy machinery and equipment from one place to another, paying them in cash. It was the victim's practice to conduct his transactions on a cash basis, and thus it was well known that he carried significant amounts of cash on his person. He normally kept his money in a clip or wallet in his right front pants pocket. He also kept a "reserve" wallet in his back pocket, but took money from that "reserve" wallet only on extremely rare occasions.

Both the defendant and John[3] were heroin addicts. On the morning of June 13, 1997, the defendant called his stepfather and asked him for money, telling him they needed the money for groceries. The stepfather refused to give the defendant and John any money, but instead offered to take them food shopping. At about 12:30 P.M., they returned to the defendant's house with the groceries. While their stepfather conversed with their grandmother, the defendant and John left the house and were seen walking in the direction of the victim's shop.

After they returned home, their stepfather agreed to give them a ride to where another brother, Mark, lived with his girl friend. Mark was both a heroin addict and a heroin dealer. When the defendant and John arrived at Mark's house, Mark's girl friend, Sherry Schlee, was there alone with her children. According to Schlee, the two brothers looked nervous and were pacing, arguing with each other. They asked Schlee for plastic bags. She gave them several bags, and they used those bags to wrap a paper bag they had brought with them. Schlee heard one brother tell the other, "I'm sure that he's dead. He's got to be dead." They then stripped off their outer clothes and footwear and asked Schlee to wash them. The defendant explained that they had run through a "swamp."

---

[2]John Brum was a codefendant. In a separate trial, he was also convicted of murder in the first degree and armed robbery.

[3]We refer to each of the defendant's brothers (John, Mark, and Joseph Brum) by their first names to avoid confusion.

Before putting the clothes into the washer, Schlee noticed spots of blood on both shirts. She confronted the defendant and John, repeatedly demanding that they tell her what they had done. The defendant eventually told her that they had gone to see their boss to ask him for money, that they had gotten into an argument with him, and that he had grabbed his boss by the neck and caught him in a headlock.[4] John told Schlee that he had hit the victim over the head with a hammer. The defendant immediately told Schlee that they were "joking." Then, while the defendant and John were not looking, Schlee touched the wrapped paper bag and felt a ball peen hammer inside.

After Schlee retrieved the washed clothes, she saw the defendant and John put the clothes into paper bags. She also saw them put a torn brown wallet and credit cards into another bag. They took the wrapped paper bag containing the hammer, along with the bags containing the clothes, wallet, and cards, and told Schlee that they were going out for a walk. They returned moments later empty-handed.

Mark arrived, bringing a bundle of heroin. Schlee attempted to speak to Mark privately, but the defendant and John told her to "shut up" and "mind [her] own business." Mark became angry, saying he "hope[d] [they] didn't do nothing stupid." The defendant replied, "[A]re you happy now that you gotta know we robbed someone?" Later on, the defendant gave Schlee a one hundred dollar bill, and asked her to buy a case of beer.[5] That night, the defendant, John, and Mark watched television, drank beer, and used drugs. At one point, Schlee overheard the defendant and John commenting that they would stay for the night because the police would be "swarming" or "surrounding" their house "when they find out what happened because

---

[4]Before trial commenced, the defendant moved to suppress his statements to Schlee on the ground that he was under the influence of drugs and alcohol and that Schlee had coerced him to speak. The judge denied the motion. The defendant does not challenge that ruling on appeal. Accordingly, we review the judge's ruling pursuant to our duty under G. L. c. 278, § 33E, to determine whether there was a substantial likelihood of a miscarriage of justice.

[5]In his confession, the defendant later admitted that money obtained from the victim's wallet was spent on heroin. Schlee, who had been extremely reluctant to divulge any information about the distribution or use of drugs in her home, testified only about buying beer with the proceeds from the robbery.

they had nothing on their hands to cover up anything left behind."

The victim was found the following morning, lying in a fetal position on the floor of his repair shop, surrounded by a pool of blood. His car keys and smashed eyeglasses were on the floor next to him. A wallet containing $600 was still in the victim's back pocket. According to the medical examiner, the victim's skull had been fractured and his head and face were covered with bruises, cuts, and lacerations as a result of sixteen to twenty blows delivered with a blunt object and a sharp object.[6] The victim also had suffered defensive injuries to his left hand and wrist. During the autopsy, the medical examiner found a fractured vertebra in the victim's neck and hemorrhages of the linings of the airways. The victim's lungs were hyperventilated. These injuries indicated that the victim had been forcefully choked or strangled, which could have been, by itself, the cause of death.

The defendant gave a statement to the police later that evening, after agreeing to come to the station.[7] The defendant told the police that he and John had gone out food shopping with their stepfather on the morning in question, and then proceeded to Mark's house where they spent the rest of the day. On being asked when he had last seen the victim, the defendant became upset and indicated that he did not want to answer any more questions.[8] At that point, the interview ended, and the police gave the defendant and John a ride back to Mark's house.[9] Meanwhile, in a separate interview, Schlee informed the police

[6]The medical examiner opined that the injuries to the victim's head and face were consistent with those that would be inflicted by a ball peen hammer and a cutting blade. He also testified that the injuries were caused by more than one weapon.

[7]Further details of the events surrounding the police interrogation of the defendant are set forth below as they relate to the defendant's motion to suppress.

[8]The fact that the defendant asserted his right to remain silent was referenced in the testimony concerning the defendant's statement, see Doyle v. Ohio, 426 U.S. 610, 619 (1976) (Doyle), but his brief does not assert this error on appeal. Under G. L. c. 278, § 33E, we address whether this Doyle error gives rise to a substantial likelihood of a miscarriage of justice. See infra at 120-122.

[9]John had accompanied the defendant to the station but had declined to give a statement at that time.

of the statements and actions of the defendant and John at her home the preceding day. This information provided probable cause to arrest the defendant and John, and they were arrested within minutes after the police had left them near Mark's house.

Back at the police station, the defendant gave another statement, this time admitting that he and John had gone to the victim's shop. The victim, having recognized them both, allowed them in. The defendant then asked the victim for money, but the victim refused. An argument ensued, during which the defendant grabbed the victim in a headlock, choked him, and threw him to the floor. The defendant claimed that the victim struck his head on a machine as he fell, and believed that the victim was already dead when he hit the floor. (In a separate statement, John admitted striking the victim's head with a hammer.) The defendant also claimed that the victim's wallet "had come loose from his pocket and presented itself on the floor."[10] The defendant picked up the victim's wallet, and he and John ran from the shop. They removed two one hundred dollar bills from the wallet, tore up the wallet and its contents, and threw them away as they ran home. Their stepfather drove them to Mark's house, where they used the money to buy heroin. The defendant explained that Schlee washed their clothing and that they disposed of the clothing in a house where their brother Joseph was doing construction work.

In a sewer near Mark's house, the police found a ball peen hammer and cutting blade that came from the victim's shop. They were wrapped in blood-stained paper towels inside plastic bags that matched those found in Schlee's kitchen. Along with these objects, the police found a crushed beer can containing the remnants of the victim's torn wallet and credit cards. Bags containing the clothing worn by the defendant and John were found in a house under construction located across the street from Mark's house.

2. *Motion to suppress.* Prior to trial, the defendant moved to

---

[10]The prosecutor argued that this aspect of the defendant's confession should not be believed. While the scene of the attack was very bloody, there was no blood whatsoever on any pieces of the wallet that were later retrieved. The jury could infer that the wallet had not fallen out but instead had been deliberately retrieved from the victim's pocket, thereby avoiding any contact with the bloody surroundings.

suppress his postarrest statement to the police. The facts surrounding the arrest and subsequent interrogation of the defendant, as found by the judge, are as follows. After the discovery of the victim's body on June 14, 1997, the police focused their investigation on three persons: the defendant, his brother John, and another employee of the victim. On the same day, Detective Thomas Chace, who was well known to the Brum family, went to the defendant's grandmother's house to look for the defendant and John. Another brother, Joseph, told Chace that his twin brothers were not home, but that he would arrange a meeting. At about 8:40 P.M., Chace spoke with Joseph, who told him that the defendant and John had agreed to meet him at Kennedy Park in Fall River. Chace arrived at the park with four other officers shortly before 9 P.M. Chace told the defendant and John that he wished to talk with them about the victim. The defendant and John agreed to go to the police station for questioning, but requested that they ride together in the same car. They rode together as requested. They were not placed under arrest, and they were not handcuffed or patted down.

They arrived at the police station at about 9:15 P.M. Chace and Trooper Christopher Dolan of the Massachusetts State police went into an interview room with the defendant. Chace read the defendant his Miranda rights, and the defendant agreed to sign a waiver form. He was expressly advised that he was not under arrest and that he was free to leave. The defendant did not appear to be under the influence of alcohol or drugs. Twenty minutes into the interview, Dolan asked the defendant when he had last seen the victim. The defendant became upset and agitated, and indicated that he did not wish to answer any more questions. At that point, the interview ended.

Chace escorted the defendant to another part of the police station, where he was reunited with John. John had declined to make any statement. The two brothers stayed chatting with Chace about matters unrelated to the case. There was also discussion concerning transportation home. The suggestion was made that they take a taxi, but the defendant and John said they had no money. There was an offer to summon a cruiser to take them home, but they insisted that they be taken in an unmarked car. Because Chace felt uneasy about being alone in an

unmarked car with the defendant and John, they had to wait nearly one hour before another detective became available to accompany Chace. Within minutes of dropping them off, Chace received a dispatch ordering him to arrest both defendants.[11] At about 11 P.M., the defendant and John were placed under arrest and transported in separate patrol cars back to the police station.

At approximately 2:15 A.M. on June 15, Chace went to the cell where the defendant was being held and told the defendant that he, Chace, wanted to talk to him. Chace handcuffed the defendant and brought him upstairs to the interview room. The defendant was once again advised of his Miranda rights, and he again indicated his willingness to speak to the police. However, the defendant repeatedly requested that John be present, explaining that "he wanted both of them to tell [the police] together what happened" and expressing an unwillingness to "rat out his brother." Chace told the defendant that the two interviews would be conducted separately, and declined to bring John into the interview room. The defendant ultimately agreed to speak without John present, but on the condition that he would talk only about his own role in the incident. He then gave the confession described above. At the end of the interview, the defendant reviewed and signed Chace's notes.[12]

Based on the foregoing, the judge concluded that the defendant validly waived his Miranda rights at the outset of both interviews, and that the defendant's statements to the police during both interviews were voluntary.[13] With respect to the first interview, the judge found that the defendant was not under arrest, had voluntarily agreed to go to the police station, and had been advised that he was free to leave. At the end of the first interview, both the defendant and John were "perfectly free to leave," but voluntarily chose to remain at the police station while awaiting a ride home. Accordingly, the judge concluded that there was not "in any sense a continuation of an arrest or a

---

[11]The decision to arrest was based on the information that had just been provided by Schlee.

[12]At trial, there was additional testimony concerning the manner in which the interview ended, which resulted in the judge's excluding the signed notes. See infra at 114-115.

[13]The defendant did not challenge the admissibility of the statement he made during the first interview.

forceful holding of the defendants" when they were subsequently interrogated at the police station following their later arrest.

The defendant argues that the judge erred in denying his motion to suppress because his invocation of his right to cut off questioning at the end of the first interview was not "scrupulously honored" when the police sought to interrogate him again after his arrest. See *Michigan* v. *Mosley*, 423 U.S. 96, 104 (1975) (*Mosley*); *Commonwealth* v. *Brant*, 380 Mass. 876, 882, cert. denied, 449 U.S. 1004 (1980). *Mosley* requires the police "to honor a decision of a person in custody to cut off questioning," and prohibits such practices as "refusing to discontinue the interrogation upon request" or "persisting in repeated efforts to wear down [the defendant's] resistance and make him change his mind." *Mosley*, *supra* at 105-106. *Mosley* protects the right of a suspect to remain silent during a custodial interrogation, and "[t]he requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting." *Id.* at 104. See *Robinson* v. *Trast*, 128 F. Supp. 2d 710, 717 (D. Kan. 2001) ("*Mosley* is premised on the inherently coercive nature of custodial interrogation and is designed to prevent the authorities from badgering a suspect in custody from the time he invokes his right to the time when the subsequent interrogation is initiated"). *Mosley* is therefore applicable to a suspect who invokes the right to remain silent during custodial interrogation, remains in custody thereafter, and is then subjected to further custodial interrogation. Accordingly, the defendant's argument is premised on the contention that he was in custody at the time of the first interview (when he declined to answer further questions) and that he remained in continuous custody up through the time of his second interview. The motion judge correctly rejected that premise.

The initial interview of the defendant was not custodial. "The crucial question is whether, considering all the circumstances, a reasonable person in the defendant's position would have believed that he was in custody." *Commonwealth* v. *Damiano*, 422 Mass. 10, 13 (1996). "In assessing the circumstances, the court considers several factors: (1) the place of the interrogation; (2) whether the officers have conveyed to the person being

questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal . . . and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest." *Commonwealth* v. *Groome*, 435 Mass. 201, 211-212 (2001). The place of the initial interrogation was the police station, but the encounter was arranged by the defendant's brother, at a time and place of the defendant's choosing and with an officer who was already well known to the defendant. The defendant was expressly told that he was free to leave. The initial interview did not convey the sense that the defendant was any more of a suspect than any other employee of the victim's establishment, e.g., there was no pointed questioning of the defendant indicating the strength of any evidence against him.[14] The motion judge found that the interview was conducted "in normal conversational tones." Finally, when the defendant terminated the first interview, he was allowed to leave the station. This was not a custodial interrogation.

Moreover, whatever the nature of that initial interrogation, it is undisputed that the defendant was thereafter released. "If custody is broken, the inherently coercive nature of custody itself is diminished and there is little to no risk of badgering by the authorities." *Robinson* v. *Trast, supra* at 717-718. See *Commonwealth* v. *Galford*, 413 Mass. 364, 369-371 (1992) (despite defendant's prior request to have lawyer present, permissible for police to resume questioning after break in custody, noting, "[w]hen a defendant is released from custody, the coercive effect of custody disappears"). While the defendant suggests that the time period of his release amounts to only the few minutes between his getting out of the unmarked cruiser and his subsequent arrest, the defendant was free to leave the police station much earlier, and was aware that he was free to go. His decision to wait at the station in order to get a ride home in an

---

[14]The police had no particular evidence against the defendant until some time later after they interviewed Schlee. See note 11, *supra.*

unmarked cruiser (having declined both the suggestion that he take a taxicab and the offer of a ride in a marked cruiser) does not amount to being "in custody" during that self-imposed wait.

The defendant also argues that his waiver of Miranda rights at the outset of the second interview was invalid because Chace and the officers overbore his reluctance to talk by denying his repeated requests to have his brother John present. The judge found that the defendant voluntarily, knowingly, and intelligently waived his Miranda rights. His finding of voluntary waiver is entitled to substantial deference. See *Commonwealth* v. *Day*, 387 Mass. 915, 920 (1983). The officers' refusal to allow John to participate in the defendant's interrogation does not undermine the voluntariness of the defendant's waiver. The officers did not attempt to trick the defendant into talking to them without his brother present, nor did they offer him anything in return for doing so. See *Commonwealth* v. *Groome*, 435 Mass. 201, 218-219 (2001); *Commonwealth* v. *Edwards*, 420 Mass. 666, 671 (1995). They did not use the defendant's request as a conduit to extract his waiver, but simply and unambiguously rejected his request. And, while they did not grant that request, the officers respected its underlying purpose, namely, the defendant's desire to tell them only about his part in the victim's murder without specifying what his brother John had done. As such, there was no error in the judge's finding that the defendant voluntarily waived his Miranda rights.

3. *The defendant's motion for a mistrial.* At trial, Dolan testified that toward the end of the second interview, the defendant blurted out, "I just fucked myself good, didn't I?" He also testified that the defendant did not want to give a written statement, but that he agreed to review Chace's interview notes. However, Dolan's testimony also mentioned that, when he began asking the defendant specific questions after the defendant's narrative version of events, the defendant "stated he didn't want to answer any more questions." Defense counsel then objected to the admission of any portion of the statement that came after

the defendant had indicated that he did not wish to answer any further questions.[15]

The judge conducted a voir dire of Dolan and Chace to determine the precise sequence of events at the end of the second interrogation. Based on that voir dire, the judge found that at the commencement of the second interview, the officers had raised with the defendant the method by which the interview would be preserved. The officers asked the defendant whether he would agree to an audiotape or videotape recording. The defendant refused. They asked him whether he would agree to make a written statement, or to sign a written statement. He again refused. They then indicated that Chace would take notes, and asked the defendant whether he would be willing to review and sign the notes. He agreed that he would. The defendant proceeded to give his statement, but concluded that statement by telling the officers that he did not wish to answer any further questions. The judge found that, after the defendant's exercise of his right to remain silent, Chace presented his notes to the defendant and asked him to review and sign them, which the defendant did. The judge found that, after signing, the defendant stated "that he had really F'd himself."

Based on that sequence of events, the judge ruled that asking the defendant to review and sign the notes was a further question that impermissibly failed to honor the defendant's invocation of his right to remain silent, and he therefore ruled that the signed notes could not be introduced in evidence.[16] However, the jury had already heard testimony to the effect that the defendant had refused to answer questions, plus testimony concerning the defendant's further remark about his predicament, which had been made after he invoked his right to remain silent. Counsel asked for a curative instruction telling the jury to disregard those two items. The judge agreed to do so.

[15]The defendant did not object to the officer's testimony concerning his invocation of his right to remain silent, and the issue is not raised on appeal. See note 8, *supra*. We address this *Doyle* error as part of our review under G. L. c. 278, § 33E. See *infra* at 120-122.

[16]Because this ruling excluding the signed version of the statement favored the defendant, we need not decide whether the officer's proceeding with the agreed format for preserving the interview was an impermissible infringement on the defendant's right to cut off questioning, and we express no opinion on whether the judge was required to exclude the signed version of the statement.

Accordingly, the judge instructed the jury to "completely disregard" evidence "to the effect that the defendant had said he wished not to answer any more questions" and evidence "that the defendant said words along the lines of, I have really F'd myself." To reinforce the instruction, the judge asked the jury to write that instruction in their notebooks. There was no objection, and testimony resumed on other subjects. Sometime later, defense counsel moved for a mistrial on the ground that the jury should not have heard evidence of the defendant's remark.[17] The judge denied the motion.

On appeal, the defendant argues that it was error not to declare a mistrial. He further contends that the judge's request that the jury write down his curative instruction exacerbated, rather than ameliorated, the prejudice to the defendant. We find that the statement was admissible, and therefore there was no basis for declaring a mistrial.[18]

Spontaneous and unprovoked statements are admissible even if made after a defendant has invoked his right to remain silent. See *Commonwealth* v. *Diaz*, 422 Mass. 269, 270-271 (1996), and cases cited; *Miranda* v. *Arizona*, 384 U.S. 436, 478 (1966) ("Volunteered statements of any kind are not barred by the Fifth Amendment [to the United States Constitution] and their admissibility is not affected by our holding today"). Here, the record shows that the defendant simply blurted out the statement ("I just fucked myself good, didn't I?") without any inducement or provocation on the part of Chace or Dolan. Notwithstanding the chronological sequence, the statement was a spontaneous remark by the defendant, not the product of any violation of his rights, and the judge's forceful instruction to disregard evidence of that statement gave the defendant more

---

[17]The request for a mistrial was not premised on the testimony that the defendant had refused to answer further questions. See notes 8 and 15, *supra*. We address that issue under G. L. c. 278, § 33E. See *infra* at 120-122.

[18]Although we need not reach the issue, we also reject the defendant's contention that having the jury make written note of the curative instruction was somehow erroneous. To the contrary, we commend the judge's utilization of this creative method to emphasize the importance of his curative instruction and make sure that all jurors were attentive during that instruction. The wording of the instruction was forceful, and this novel approach to delivering a curative instruction could only serve to make it even more forceful.

than he was entitled to.[19] Accordingly, the judge did not err in refusing to declare a mistrial.

4. *John's statements.* Hoping to bolster his theory that his brother John was solely responsible for the victim's injuries, the defendant sought to introduce a portion of John's statement to the police, in which John admitted that he struck the victim's head with a hammer "two or three times." After John invoked his Fifth Amendment privilege, the judge allowed the defendant to introduce that portion of John's statement. The prosecutor then sought to introduce the entire balance of John's statement, based on the principle of completeness. The defendant objected. Following a sidebar conference, the judge allowed the prosecutor to introduce only two specific portions of John's statement: (1) that the victim's wallet had popped out of his pocket and was lying on the floor when they took it; and (2) that he and the defendant had ripped up the victim's wallet and credit cards and disposed of them while running back to their grandmother's house. The defendant argues that those two statements constituted inadmissible hearsay, and that their admission at trial violated his right of confrontation. See *Bruton* v. *United States*, 391 U.S. 123, 135-136 (1968).

We agree with the judge that the two statements were offered for a nonhearsay purpose and therefore were not hearsay. The prosecutor offered the statements not for their truth, but rather to show that the defendant and John had given identically false accounts of the same precise details.[20] See *Anderson* v. *United States*, 417 U.S. 211, 219-220 (1974) (out-of-court statements

---

[19]We also note that the remark itself added nothing of substance to the highly incriminating detailed confession the defendant had just made. The defendant had already admitted going to the victim's shop, arguing with him, choking him to death, and running off with his wallet. The defendant's further observation in vernacular terms to the effect that he was in trouble as a result of that confession merely states the obvious. It would not alter the jury's assessment of the evidence. Even if erroneously introduced, the defendant's remark would not warrant a mistrial.

[20]This was offered in support of the Commonwealth's contention that there was a joint venture, and that the joint venture had continued to operate after the actual perpetration of the crime. The prosecutor used John's statement in this fashion during her closing argument, unambiguously explaining to the jury the Commonwealth's theory that these portions of John's statement were false.

nonhearsay when offered "simply to prove that [they] were made so as to establish a foundation for later showing, through other admissible evidence, that they were false"); *Commonwealth* v. *Silanskas*, 433 Mass. 678, 693-694 (2001).

Admission of the two statements did not offend the defendant's right of confrontation. Confrontation issues arise when hearsay evidence is admitted as substantive evidence, but the "*nonhearsay* aspect of [a codefendant's] confession . . . raises no Confrontation Clause concerns" (emphasis in original). *Tennessee* v. *Street*, 471 U.S. 409, 414 (1985). See *Dutton* v. *Evans*, 400 U.S. 74, 88 (1970) (plurality opinion) ("Neither a hearsay nor a confrontation question would arise had [the witness's] testimony been used to prove merely that the [out-of-court] statement had been made"). Where, as here, an out-of-court statement is being introduced solely for the purpose of showing that it had been made, the witness on the stand who overheard that statement provides direct evidence that the statement was made, and that witness is subject to cross-examination. Because the only fact at issue is whether the statement was made, not its underlying truth, there is no need to confront the original declarant. See *Tennessee* v. *Street*, *supra* (confrontation right protected by officer's "presence on the stand" because if counsel wanted to attack whether accomplice's "confession was accurately recounted, he was free to cross-examine the [officer]").

To whatever extent (if any) the jury viewed these portions of John's statement as true, their substantive contents were not prejudicial to the defendant's case. In his own confession, the defendant claimed that the wallet had fallen out of the victim's pocket as he fell to the floor, and the defendant attempted to convince the jury of the truth of that version of events.[21] John's statement to the effect that the victim's wallet had unexpectedly fallen out of his pocket after the assault would only serve to corroborate the very version that the defendant wanted the jury to believe. Similarly, the defendant's own statement admitted

[21]The defense strategy in that regard was to undermine the Commonwealth's theory that the brothers had intended to rob the victim. To the extent that the taking of the victim's wallet was a spontaneous and unrelated afterthought, not the purpose of the attack, there would be no armed robbery and no felony-murder.

that he had grabbed the wallet, run out of the shop, taken the money from the wallet, and disposed of the wallet and its remaining contents as they ran down the street. John's statement merely repeated the same thing.[22] Again, if used for its truth, John's statement corroborated the version of events that the defendant had already provided. As such, the substance of John's statement did not incriminate the defendant in any manner that went beyond the defendant's own confession. Nor did it undermine (or even address) the principal theory of the defense, namely, that all the fatal blows to the victim's head had been inflicted by John, not by the defendant. The only manner in which these excerpts from John's statement could incriminate the defendant was in the nonhearsay purpose for which the Commonwealth offered them, i.e., to demonstrate that the defendant and John had made statements that were identically false on the precise same points, and thereby suggest that they had, in furtherance of their joint venture, contrived to invent the same version. There was no error in admitting these portions of John's confession, and no potential prejudice from any misuse of these portions of John's confession.

5. *Closing argument.* The defendant argues that the prosecutor made improper comments in her closing argument and thereby denied him a fair trial. Referring to the defendant's alleged failure to remember what he argued with the victim about before choking him, the prosecutor stated:

> "What did the defendant . . . lie to the police about? . . . The first thing that he lies about is, well, 'what was your argument with [the victim] about?' Well, I can't recall. Hello. I went down there to get money. I needed money for heroin and drugs, but I can't remember what I argued with him about? Oh, please."

The defendant objected, arguing that there was no evidence that the defendant went to the victim's shop to get money for drugs. The judge ruled that the prosecutor's comments were not improper, and gave the jury only the customary admonition that counsel's arguments do not constitute evidence. We review

---

[22]Schlee's testimony and the later recovery of the wallet indicated that the defendant had in fact retained the wallet and disposed of it elsewhere.

whether the prosecutor's statements were improper and, if so, whether the impropriety "constituted prejudicial error." *Commonwealth* v. *Wilson*, 427 Mass. 336, 351 (1998), quoting *Commonwealth* v. *Santiago*, 425 Mass. 491, 500 (1997), *S.C.*, 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998).

The evidence supported the inference that the defendant sought money from the victim for the purpose of buying drugs. The defendant and John were heroin addicts; their attempt to get cash from their stepfather (ostensibly for groceries) had been rebuffed; the stepfather's purchase of groceries for them had not satisfied their claimed need for money; and, immediately after the crime, they went to the home of their heroin-dealing brother and spent the victim's $200 on drugs and alcohol. There was a sound basis for argument that the defendant intended to buy drugs with whatever money he could obtain from the victim. See *Commonwealth* v. *Pope*, 406 Mass. 581, 587 (1990) (no error where prosecutor's statements were "fairly inferable from the evidence presented"). The prosecutor never attributed her comments to the defendant, as illustrated by her apparent sarcastic tone and use of colloquialisms ("Hello" and "Oh, please"), and the "jury could not have been misled into thinking that [she] was giving them a verbatim quote of [the defendant's] statements." *Commonwealth* v. *Rivera*, 52 Mass. App. Ct. 321, 326 (2001). Viewed in context, see *Commonwealth* v. *Santiago*, *supra*, the prosecutor merely resorted to brief sarcasm to point out the absurdity of the defendant's claimed inability to remember the subject of his argument with the victim. See *Commonwealth* v. *Wilson*, *supra* at 350, quoting *Commonwealth* v. *Sanna*, 424 Mass. 92, 107 (1997) (" '[E]nthusiastic rhetoric, strong advocacy, and excusable hyperbole' are not grounds for reversal").

6. *Instruction on felony-murder in the second degree.* Finally, the defendant argues that the judge erred in refusing to instruct the jury on felony-murder in the second degree with larceny from the person as the predicate felony.[23] He contends that, on one view of the evidence, his decision to take the victim's wal-

---

[23]Any error in failing to instruct the jury with respect to felony-murder in the second degree would be harmless. The defendant was also convicted

let was made on the spur of the moment after the assault when the wallet unexpectedly popped out of the victim's pocket and "presented itself on the floor."

The defendant's own "afterthought" claim defeats his request for an instruction on felony-murder in the second degree. "Felony-murder in the second degree requires a finding that the homicide occur 'in the commission or attempted commission' of a felonious crime. G. L. c. 265, § 1. For a killing to be committed 'in the commission or attempted commission' of a felony some causal connection between the felony and the homicide must exist. If, as the defendant contends, the larceny was committed as an afterthought to a homicide, there is no causal relationship to the death[]" (citation omitted). *Commonwealth* v. *Christian*, 430 Mass. 552, 559 (2000).

7. *Review under G. L. c. 278, § 33E.* We have reviewed the entire record pursuant to G. L. c. 278, § 33E, and address two issues not raised by the defendant's brief.

a. *Evidence of the defendant's assertion of his right to remain silent.* Both Dolan and Chace testified concerning the defendant's first statement to the police, and both related that, after giving his own narrative and answering a couple more specific questions, the defendant stated that he did not want to answer any more questions. When Dolan so testified, there was no objection. As discussed above, the jury also heard Dolan's testimony concerning the defendant's second statement, in which the defendant concluded the interview by stating that he did not want to answer any more questions. Although there was no objection at the time, the judge gave a forceful curative instruction and asked the jury to write the instruction down in their notebooks. Later on, Chace's testimony concerning the defendant's first statement also referenced the defendant's termination of that interview. Defense counsel objected; the judge sustained the objection and gave an immediate and forceful curative instruction.

A defendant may not be impeached with his silence, nor may his silence be used in any way to infer guilt. See *Doyle* v. *Ohio*, 426 U.S. 610, 618-619 (1976) (*Doyle*); *Commonwealth* v. *De-*

---

under the alternate theories of deliberate premeditation and extreme atrocity or cruelty. See *Commonwealth* v. *Doucette*, 430 Mass. 461, 470 (1999).

*Pace*, 433 Mass. 379, 382-383 (2001), and cases cited. It does not appear that there was any need to resort to the defendant's invocation of his right to remain silent as a method of explaining any abrupt end to either interview, or any other permissible basis for admitting evidence of the defendant's refusal to answer further questions. See *Commonwealth* v. *DePace, supra* at 383-384; *Commonwealth* v. *Waite*, 422 Mass. 792, 799 n.5 (1996) ("prosecutors and judges must make efforts to discern ways to present the questioning as complete, so as to prevent the need to explain a seemingly abrupt end to interrogation"). In the first statement, the defendant had given a narrative account of his whereabouts and activities on the day of the murder (in which he denied having seen the victim), and there was nothing that would seem abrupt or unusual about ending the interview at that point. With regard to the second statement, the defendant had given a complete and detailed confession, and there was similarly no need to provide any explanation as to how or why the interview concluded. As such, the references to the defendant's invocation of his right to remain silent were improper.

We are satisfied, however, that these improper references did not give rise to a substantial likelihood of a miscarriage of justice. We consider five factors in assessing the impact of a *Doyle* error: "(1) the relationship between the evidence and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or quantum of evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative instructions" (footnotes omitted). *Commonwealth* v. *Mahdi*, 388 Mass. 679, 696-697 (1983). Here, although the error was committed by the prosecution and the improper reference was made three times, the remaining factors point overwhelmingly to no substantial likelihood of a miscarriage of justice. The references bore no relationship to the premise of the defense: John's responsibility for the murder and the defendant's lack of participation in the actual killing or in any joint venture. The evidence of the defendant's guilt was overwhelming, based on the defendant's confession, Schlee's testimony, the forensic evidence concerning the use of two weapons, and the recovery of the clothing and murder weapons. Strong curative instruc-

tions were given by the judge and written down by the jury.[24] Moreover, at no time did the prosecutor suggest to the jury that guilt should be inferred from the defendant's termination of questioning. The prosecutor's closing argument made no reference to the manner in which either interview had been terminated, and instead focused appropriately on the contents of the confession that the defendant had ultimately given. See *Commonwealth* v. *Fowler,* 431 Mass. 30, 42-43 (2000); *Commonwealth* v. *Peixoto,* 430 Mass. 654, 661 (2000).

We reiterate, however, that "[t]he nature of a *Doyle* error is so egregious that reversal is the norm, not the exception." *Commonwealth* v. *DePace, supra* at 385, quoting *Commonwealth* v. *Madhi, supra* at 698. We again caution prosecutors to avoid questions that will elicit testimony concerning a defendant's invocation of the right to remain silent, see *Commonwealth* v. *Waite, supra,* and recommend that in trial preparation they caution their witnesses to avoid inadvertent references that would give rise to any potential *Doyle* error. Absent some applicable exception, such testimony is improper and will normally result in reversal of any conviction. See *Commonwealth* v. *Madhi, supra.*

b. *Erroneous instruction on voluntary manslaughter.* The defendant requested and the judge gave instructions on voluntary manslaughter, premised on provocation and the use of excessive force in self-defense. In doing so, the judge included an erroneous description of the burden of proof on those issues. See *Commonwealth* v. *Acevedo,* 427 Mass. 714, 716 (1998). However, there was no evidence warranting a voluntary manslaughter instruction, and therefore no likelihood of a miscarriage of justice stemming from this error. Indeed, the judge noted that there was no evidence of provocation and no evidence raising the issue of self-defense, but agreed to give a voluntary manslaughter instruction as requested only in an "abundance of caution." We conclude that relief under G. L. c. 278, § 33E, is not appropriate.

*Judgments affirmed.*

---

[24]The judge's final instructions also included an eloquent description of the defendant's right to remain silent at trial.