## COMMONWEALTH VS. FRED DIXON.

No. 09-P-1190.

Bristol. November 18, 2010. - June 23, 2011.

Present: LENK, VUONO, & RUBIN, JJ.[1]

*Homicide. Joint Enterprise. Practice, Criminal,* Motion to suppress, Voluntariness of statement, Harmless error. *Evidence,* Voluntariness of statement, Joint venturer. *Error, Harmless.*

A Superior Court judge hearing the criminal defendant's pretrial motion to suppress three statements that he made to police erred in denying the motion with regard to one statement, where a reasonable person in the defendant's position would have perceived a question by a booking police officer, even if not directly posed to the defendant, as interrogation, and where the defendant's statement could not be considered unresponsive and therefore spontaneous [707-710]; however, the admission of the statement at trial was harmless beyond a reasonable doubt, where the strength of the independent, properly admitted evidence was overwhelming [710-711].

At a murder trial at which the Commonwealth proceeded on a theory of joint venture, the evidence was sufficient to permit the jury to conclude that the defendant was present at the time of the killing, and that he and his coventurer were willing and available to assist the other if necessary; further, the evidence was sufficient to permit the jury to conclude that the defendant and the coventurer intended, at a minimum, to cause the victim grievous bodily harm. [711-712]

INDICTMENT found and returned in the Superior Court Department on September 16, 2004.

A pretrial motion to suppress evidence was heard by *Gary A. Nickerson,* J., and the case was tried before *E. Susan Garsh,* J.

*Alan Jay Black* for the defendant.

*William R. Connolly,* Assistant District Attorney, for the Commonwealth.

VUONO, J. On the evening of June 29, 2004, Fall River police

---

[1]Justice Lenk participated in the deliberation on this case while an Associate Justice of this court, prior to her appointment as an Associate Justice of the Supreme Judicial Court.

officers responded to the report of a domestic disturbance at Ship's Cove Apartments (Ship's Cove) and discovered the body of the victim, Rey Davila, underneath his wheelchair in a stairwell. The defendant and another man, Felix Marrero, were charged in separate indictments with murder in the first degree. It was the Commonwealth's trial theory that the defendant and Marrero engaged in a joint venture to rob the victim and that during the course of that robbery the victim was beaten and pushed down the stairwell where he died.[2] A Superior Court jury convicted the defendant of murder in the second degree. At a separate jury trial, Marrero was acquitted.

On appeal, the defendant challenges the denial of his motion to suppress statements he made in the booking room at the police station. The statements were made after he had received Miranda warnings and had invoked his right to remain silent. See *Miranda* v. *Arizona*, 384 U.S. 436 (1966). He also challenges the sufficiency of the Commonwealth's evidence.[3] For the reasons that follow, we conclude that one of the statements introduced in evidence at trial was obtained in violation of the defendant's constitutional rights and should have been suppressed. However, because the admission of this statement was harmless beyond a reasonable doubt, we affirm the judgment of conviction.

1. *Background.* We summarize the evidence as developed at trial. The victim's body was found at approximately 9:30 P.M. on a landing between the third and fourth floors of a stairwell located next door to the defendant's apartment. The victim's jeans had been pulled down and his right pocket had been turned inside out. According to the medical examiner, the victim suffered two fractures of the jaw, a dislocated neck and numerous lacerations and abrasions. He opined that the victim had sustained blunt trauma to his head and neck and had died as a result of those injuries.

The victim and the defendant both lived on the fourth floor

---

[2]The Commonwealth proceeded on theories of extreme atrocity or cruelty and deliberate premeditation, in addition to felony-murder (attempted unarmed robbery constituting the underlying felony).

[3]The defendant's additional claims concerning certain evidentiary rulings and trial counsel's failure to move for a mistrial have not been overlooked. These arguments have no merit and do not require any discussion.

of Ship's Cove; the victim lived in apartment 412 at the south end of the complex while the defendant, along with his girlfriend and their son, lived in apartment 401 at the north end. Ship's Cove was equipped with security cameras which recorded the following sequence of events before the victim's body was found.

At approximately 9:16 P.M., the victim entered the building through the first-floor lobby and took the elevator to the fourth floor. The defendant, Marrero, and several other persons entered the lobby seconds later. The group, which included another resident of Ship's Cove, Karrah Kenner, entered the lobby elevator. Kenner, who lived across the hall from the defendant, went to the fourth floor while the defendant and Marrero remained in the elevator, exiting on a higher floor. Within minutes, however, the defendant and Marrero took the elevator back to the fourth floor.

Shortly thereafter, the defendant's next door neighbor, Maria Carreiro, heard a man scream more than once, "No, no, please, no, no." The voice was coming through the wall adjacent to the defendant's apartment. Carreiro called the police. She then observed the wall near her front door shaking, and heard the door to the defendant's apartment open. Next, she heard the door to the fire stairs (stairwell) open, followed by the sound of "[s]omething rolling down the stairs."

Around the same time, Kenner and her boyfriend, Jason Alves, heard loud noises coming from the defendant's apartment.[4] Alves knocked on the defendant's apartment door and asked if everything was all right. No one opened the door but a voice which both Kenner and Alves recognized as the defendant's answered, "Everything is all right, Fam."

At approximately 9:38 P.M., two Fall River police officers arrived in response to Carreiro's call, just as the defendant and Marrero were leaving the building through the door at the south stairwell. After the police discovered the victim's body, they secured the scene and obtained a search warrant for the defendant's apartment. During the execution of the warrant, police observed blood stains on the wall which separated the defendant's apartment from Carreiro's apartment. They also recovered

---

[4]Alves testified that he heard a bang, and Kenner testified that she heard the sound of glass breaking.

a baseball cap similar to the one Marrero was observed wearing when he entered the lobby earlier that evening, and a paper bag similar to the bag that the defendant had been carrying when he first entered the elevator. The police also observed blood in the stairwell where the body was found. Deoxyribonucleic acid (DNA) testing revealed that the blood in the defendant's apartment and the stairwell matched the victim's DNA profile. DNA testing on the baseball cap revealed the presence of three DNA profiles, one of which matched Marrero's DNA profile. Also, Marrero's fingerprints matched a latent fingerprint found on the paper bag.

Later in the evening of June 29, the defendant and Marrero were seen together at Marrero's apartment building. Marrero had changed his shirt and was no longer wearing a cap. In the late afternoon on the following day, June 30, 2004, the defendant and Marrero stopped briefly at the home of the defendant's cousin, Helen Deans. During the visit, the defendant told Deans that "something happened." The defendant and Marrero were also observed together on July 1, and were arrested together in Boston on July 2, 2004.

As will be discussed in more detail in connection with our analysis of the denial of the motion to suppress, the defendant made a number of incriminating statements during the booking process at the Fall River police station. The jury heard testimony that in response to a question posed by the booking officer about whether a weapon had been used during the incident, the defendant stated, "The dude hit us." The Commonwealth also introduced evidence that while the defendant was using the telephone in the booking room, he was overheard saying, "You're pregnant?" and "I fucked up. I fucked up."

2. *Denial of the defendant's motion to suppress.* Prior to trial the defendant moved to suppress three statements he made at the Fall River police station, claiming that they were obtained in violation of his right to remain silent, as guaranteed by the Fifth Amendment to the United States Constitution.[5] After an

[5]The motion also alleged that the defendant's rights under the Sixth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights had been violated. We analyze the issue under the Fifth Amendment only since the defendant has made no separate argument under the Sixth Amendment or art. 12.

evidentiary hearing at which various police officers testified, the motion was denied. We summarize the facts from the judge's findings, supplemented where appropriate with the uncontradicted testimony of the officers, whom the judge explicitly credited. See *Commonwealth* v. *Watson*, 430 Mass. 725, 726 n.5 (2000).

As noted, the defendant and Marrero were arrested on July 2, 2004. After initially being booked at the State police barracks in the South Boston section of Boston, he was transported to the Fall River police station. There, he was taken to an interview room, where he was given his Miranda rights and signed a Miranda form, indicating that he understood those rights. The defendant, both orally and in writing, informed the officers that he did not wish to speak to them.[6] At that point, the formal interview ended and the defendant was escorted to the booking room by Fall River police Detective Thomas Chace and State police Trooper Ann Marie Robertson.

Fall River police use a computerized booking program. For backup purposes, however, the booking officer keeps handwritten notes on the names of the arrestees, the date and time each arrestee is booked, and the offenses charged. Marrero was booked prior to the defendant. When the defendant arrived in the booking room, he saw a clipboard on which the booking officer, Officer Jeffrey Maher, had written that Marrero had been charged with accessory after the fact to murder. Upon reading this, the defendant exclaimed, "What the fuck? He's being charged with accessory and I got the murder charge?"

Thereafter, the defendant answered a number of routine booking questions posed by Officer Maher. Throughout the booking, the defendant was handcuffed and stood at arm's length from Officer Maher across a waist-high counter. Detective Chace was standing directly beside the defendant, and Trooper Robertson stood five feet to the defendant's right. On the counter was a computer into which Officer Maher entered the information he received from the defendant.

The computer program presents its user (in this case Officer Maher) with a series of requests for specific information to be

---

[6]It is unclear from the record whether the defendant also asserted his right to counsel.

entered on a number of consecutive "pages" or "screens." Unless the requested information is entered into the appropriate field, the program will not allow a user to proceed to the next page or to complete the booking procedure.[7] Where, as in this case, the charged offense is a crime of violence, the booking program requires the booking officer to answer an inquiry whether a weapon was used. Upon reaching this prompt, Officer Maher asked Detective Chace, who was still standing directly to the defendant's left, whether a weapon was used during the incident. Detective Chase did not respond, but the defendant stated, "The dude hit us." Officer Maher entered "unknown" or "none" into the computer and proceeded with the remainder of the booking questions.

After the booking process was completed, the defendant was permitted to make a telephone call from a telephone located approximately three feet from the booking area. While the defendant was talking on the telephone to someone he called "Boo," he was overheard by police saying, "You're pregnant?" and "I fucked up. I fucked up."

On the basis of these facts, the motion judge concluded that the defendant was in custody and had asserted his right to remain silent. The judge further concluded that although the "officers [were] bound to follow the dictates of Miranda and its progeny," the defendant's statements were volunteered, and therefore they were not barred by the Fifth Amendment.[8]

---

[7] In his testimony, Officer Maher characterized this element of the program as "a glitch that occurs and we deal with."

[8] The judge found that the first statement the defendant sought to suppress, "What the fuck? He's charged with accessory. I'm charged with murder," was "wholly impromptu" and, as such, was not the product of custodial interrogation and not subject to suppression. With respect to the second statement, "The dude hit us," the judge concluded that it also was not the product of custodial interrogation or its functional equivalent because (1) the statement was not responsive to Officer Maher's question whether a weapon had been used; (2) the question was posed to Detective Chace and not to the defendant; (3) Officer Maher was not "objectively" seeking an incriminating response when he posed the question; and (4) the question itself was a noninvestigatory routine booking question and therefore did not constitute interrogation within the meaning of Miranda. With respect to the third group of statements, those made by the defendant while he was talking on the telephone, the judge found that "in no way" were the statements compelled by the police, and therefore, they were not the product of interrogation.

In reviewing a judge's ruling on a motion to suppress, we accept the "judge's subsidiary findings of fact absent clear error, but conduct an independent review of the judge's ultimate findings and conclusions of law." *Commonwealth* v. *Washington,* 449 Mass. 476, 480 (2007). The judge was correct to deny the defendant's motion to suppress as to the first and third statements, but he erred in failing to suppress the second statement: "The dude hit us."

Once a defendant has invoked his right to remain silent, interrogation must immediately cease and the invocation must be "scrupulously honored." *Michigan* v. *Mosley,* 423 U.S. 96, 104 (1975), quoting from *Miranda* v. *Arizona,* 384 U.S. at 479. *Commonwealth* v. *Brant,* 380 Mass. 876, 884, cert. denied, 449 U.S. 1004 (1980). "Interrogation" in this context, as the judge recognized, refers not only to express questioning, but also to its "functional equivalent," that is, "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island* v. *Innis,* 446 U.S. 291, 300-301 (1980). In determining whether the functional equivalent of interrogation has occurred, the focus is not on the subjective intent of the particular police officer but rather on whether a reasonable person in the suspect's position would perceive the police statements and conduct as interrogation. See *Commonwealth* v. *Torres,* 424 Mass. 792, 797 (1997); *Commonwealth* v. *Braley,* 449 Mass. 316, 324 (2007). A statement that is volunteered — unprovoked by direct questioning or its functional equivalent — is not the product of interrogation and is not subject to suppression, even if preceded by an invocation of the right to remain silent. See *Miranda, supra* at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today"); *Commonwealth* v. *Brum,* 438 Mass. 103, 115 (2002), *S.C.,* 441 Mass. 199 (2004) ("Spontaneous and unprovoked statements are admissible even if made after a defendant has invoked his right to remain silent").

The only issue which merits discussion is whether the defendant's statement, "The dude hit us," was the product of interroga-

tion within the meaning of *Miranda.*[9] We begin our analysis by
observing the obvious: Officer Maher asked a question, namely
"Was there a weapon used?" This fact alone distinguishes this
case from those where a suspect unforeseeably interjects a remark
in an ongoing conversation amongst police officers. Compare,
e.g., *Innis, supra* at 302 ("conversation [that] was, at least in
form, nothing more than a dialogue between the two officers to
which no response from the respondent was invited" not the
functional equivalent of interrogation); *Commonwealth* v. *Caputo,*
439 Mass. 153, 161 (2003) (no interrogation where "defendant's
statement occurred only after and apparently because he had
overheard the telephone conversation"). Nevertheless, the Com-
monwealth contends that Officer Maher's question did not con-
stitute interrogation or its functional equivalent because (1) the
question was posed to Detective Chace and not to the defendant,
and (2) the defendant's statement was not responsive to Officer
Maher's question whether a weapon had been used.[10]

While we accept the finding of the motion judge that Officer
Maher's question was directed at Detective Chace (a fact the
judge relied on in concluding that the question did not constitute
*express* interrogation), the mere fact that Officer Maher directed

___

[9]The first statement was not introduced at trial. As to the third statement,
the defendant contends that "forcing a defendant to exercise [his statutory
right under G. L. c. 276, § 33A,] in the presence of police" renders it meaning-
less and creates an irreconcilable conflict with a suspect's Fifth Amendment
right to remain silent. This contention lacks merit. "There is no requirement
that a defendant be permitted a private telephone call, and a defendant does
not have an expectation of privacy in making such a telephone call." *Com-
monwealth* v. *Williams,* 456 Mass. 857, 866 (2010). See *Commonwealth* v.
*Garcia,* 409 Mass. 675, 686 (1991) (defendant who chooses to make telephone
call pursuant to G. L. c. 276, § 33A, within obvious earshot of police officers
enjoys no expectation of privacy).

[10]The Commonwealth acknowledges that the question itself was not a
routine booking question. See *Pennsylvania* v. *Muniz,* 496 U.S. 582 (1990).
The booking exception applies only to routine biographical questions, not to
those "that are designed to elicit incriminatory admissions." *Commonwealth*
v. *Woods,* 419 Mass. 366, 373 (1995). Nor does the booking exception
encompass, as the motion judge concluded, the collection of statistical data
about crimes. In the future, it is preferable, unless a subject has waived his
Miranda rights, to eliminate questions about weapons from the litany of ques-
tions asked at booking. See *Commonwealth* v. *Guerrero,* 32 Mass. App. Ct.
263, 268 (1992) (questions relating to occupation and employment are not
pertinent to custodial responsibilities of police).

his question to Detective Chace does not address the critical question under *Innis*, which is whether a reasonable person in the suspect's position would perceive the question, even if not directly posed to him, as interrogation.[11]

We conclude that a reasonable person in the defendant's position would so perceive Officer Maher's question. The undisputed testimony of Detective Chace and Trooper Robertson, both of whom the judge found credible, establishes that immediately prior to asking the question whether a weapon was used, Officer Maher had been posing questions directly to the defendant. Moreover, at the moment that Officer Maher asked the question, the defendant (in handcuffs) and Detective Chace were standing directly beside one another approximately three feet away from, and both facing, Officer Maher.[12] These facts do not support the Commonwealth's assertion that the statement was spontaneous. Rather, they support the defendant's assertion that a reasonable person would have believed that a response to the question was required.

Furthermore, we are not persuaded that the defendant's statement should be deemed spontaneous on the basis that it did not directly respond to Officer Maher's question. While there are cases in which a defendant's "totally unresponsive" statement has been held, in part for that reason, to be "spontaneously volunteered," see, e.g., *United States* v. *Castro*, 723 F.2d 1527, 1530 (11th Cir. 1984), this is not such a case.

In these circumstances, Officer Maher "should have known" that posing a substantive question directly relating to the facts of the crime under investigation, both in the presence of the defendant and in the course of obtaining other information from him, was "reasonably likely" to (and did) elicit an incriminating

[11]Although the motion judge set out the proper standard, specifically noting that the "subjective concerns" of Officer Maher were "of little final effect," he focused almost entirely on Officer Maher's intent in determining whether the question to Detective Chace constituted the functional equivalent of interrogation. See, e.g., *Braley*, *supra* at 324, quoting from *Torres*, *supra* at 797 ("[t]he ' "functional equivalence" test does not turn on the subjective intent of the particular police officer' ").

[12]Compare *United States* v. *Barlow*, 839 F. Supp. 63, 68 (D. Me. 1993) (statement from defendant not reasonably required or invited where police discussion occurred four to six feet from defendant and police had their backs turned to him).

response. Moreover, we are not persuaded that a computer "glitch" that requires police to inquire into the specifics of the charged offense in the presence of the accused removes those questions from the constitutional analysis. The question was a direct and explicit inquiry about the crime for which the defendant was being booked. As such, the police conduct amounted to the functional equivalent of interrogation and a plain failure to "scrupulously honor" the defendant's unequivocal invocation of his right to remain silent. Consequently, the statement should have been suppressed.

As we have concluded that the defendant's statement, "The dude hit us," should not have been admitted, the question we must now address is whether its erroneous admission was harmless beyond a reasonable doubt. "To answer the question, 'we analyze the case to see whether the error might have had an effect on the jury or contributed to the verdicts, and whether the Commonwealth's evidence was " 'merely cumulative' of evidence properly before the jury," . . . or was overwhelming without the erroneously admitted evidence.' " *Commonwealth* v. *McNulty*, 458 Mass. 305, 319 (2010), quoting from *Commonwealth* v. *Dagraca*, 447 Mass. 546, 553 (2006).

Here, the "overwhelming" strength of the independent, properly admitted evidence assures us that the guilty verdict in this case was not attributable to the error. That evidence included (1) video surveillance depicting the defendant (and the victim) at the scene at the relevant time; (2) testimony from the defendant's next door neighbor who reported hearing a struggle in the defendant's apartment; (3) testimony from the neighbors across the hall who, prompted by the commotion, knocked on the apartment door and spoke to the defendant; (4) DNA test results linking the blood found inside the defendant's apartment to the victim; and (5) two separate admissible remarks by the defendant following the incident: the defendant told his cousin that "something happened," and acknowledged that he had "fucked up" when he spoke to his girlfriend on the telephone at the police station. This evidence was sufficient not merely to sustain the defendant's conviction, but also to nullify any effect the erroneously admitted statement "might have had" on the jury.[13]

---

[13]Furthermore, the evidence of guilt was not entirely circumstantial, as the

See *Commonwealth* v. *Vasquez*, 456 Mass. 350, 373 (2010) (Cordy, J., concurring in part and dissenting in part).

3. *Sufficiency of the evidence.* The defendant claims that his conviction is legally unsupportable because the evidence was insufficient to show that he and Marrero were engaged in a joint venture or that he harbored malice, the requisite mental state for murder in the second degree, toward the victim. Applying the well-established standard set forth in *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979), we conclude otherwise.

"A defendant is guilty as a joint venturer 'if the Commonwealth has proved beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense.' " *Commonwealth* v. *Deane*, 458 Mass. 43, 50 (2010), quoting from *Commonwealth* v. *Zanetti*, 454 Mass. 449, 468 (2009). Here, the Commonwealth was required to prove that "the defendant was present at the scene of the murder, with the knowledge that another intends to commit a crime or with intent to commit the crime and by agreement was willing and available to assist if necessary." *Deane*, *supra*, citing *Commonwealth* v. *Phillips*, 452 Mass. 617, 633 (2008).

The jury reasonably could have inferred that the defendant was present at the time of the killing on the basis of the surveillance recordings and the testimony of the defendant's neighbors that the defendant was in his apartment when a struggle or altercation between the defendant, Marrero, and the victim occurred. The jury also could have inferred that during this altercation the victim sustained injuries serious enough to have left blood on a wall of the defendant's apartment, and that the struggle concluded with the defendant or Marrero or both wheeling the victim out of the apartment, through the fire door and down the fire stairs.

Furthermore, the evidence that the defendant and Marrero were together when they entered the building before the murder

defendant asserts. Contrast *Commonwealth* v. *Dagraca*, 447 Mass. at 554. Nor was the statement in question particularly important to the prosecution in view of the physical (video surveillance) and scientific (DNA) evidence linking the defendant to the crime. Finally, we observe that the statement was introduced only once during trial and the prosecutor did not refer to it in closing argument. Compare *id.* at 555.

and that they fled the building together afterward could have supported a finding that each of them was willing and available to assist the other if necessary. See *Commonwealth* v. *Williams*, 422 Mass. 111, 121 (1996) ("Joint venture may be proved by circumstantial evidence, including evidence of flight together").

The jury also could have determined that the defendant acted with malice. The manner in which the victim was killed, beaten and pushed down a stairwell, supports a finding that the defendant (and Marrero) intended, at a minimum, to cause the victim grievous bodily harm. See *Commonwealth* v. *Pasteur*, 66 Mass. App. Ct. 812, 817 (2006), quoting from *Commonwealth* v. *Gaboriault*, 439 Mass. 84, 92 (2003) ("Malice for purposes of murder in the second degree . . . [is] present when an individual has a specific intent to cause grievous bodily injury and a death occurs, or when an individual intentionally takes action where in the circumstances a reasonable person would know that there was 'a plain and strong likelihood that death would follow the contemplated act' ").

*Judgment affirmed.*